RON BENDER (SBN 143364)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: RB@LNBYG.COM; KJM@LNBYG.COM; LLS@LNBYG.COM

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>TRX HOLDCO, LLC, a Delaware limited liability company,<br><br>       Debtor and Debtor in Possession.<br>_____<br>In re:<br><br>FITNESS ANYWHERE LLC, a Delaware limited liability company, dba TRX and TRX Training,<br><br>       Debtor and Debtor in Possession.<br>_____<br><br>☒ Affects both Debtors<br><br>☐ Affects TRX Holdco, LLC only<br><br>☐ Affects Fitness Anywhere, LLC only | Lead Case No.: 8:22-bk-10948-SC<br><br>Jointly administered with:<br>8:22-bk-10949-SC<br><br>Chapter 11 Cases<br><br>**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361, 362 AND 363; (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b); AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**[Declarations of Brent Leffel, James S. Feltman, Joshua Benn and Krikor J. Meshefejian filed herewith]**<br><br>DATE:     June 10, 2022<br>TIME:     10:00 a.m.<br>PLACE:   *Via ZoomGov<br>           Courtroom 5C<br>           411 West Fourth Street<br>           Santa Ana, CA 92701 |

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 11

I. STATEMENT OF FACTS .................................................................................. 11

    A.    Brief Description Of The Debtors And Their Business. ...................................... 11

    B.    Events Leading To Bankruptcies And The Debtors' Chapter 11 Goals. .............. 13

    C.    The Debtors' Primary Assets and Secured Loans.................................................. 15

    D.    The Debtors' Urgent Need For Use Of Cash Collateral. ...................................... 17

II. THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL ............... 19

    A.    The Debtors Must Be Authorized To Use Cash Collateral To Operate,
        Maintain And Preserve Their Assets In Accordance With The Budgets.............. 19

    B.    The Sole Pre-Petition Secured Party Is Adequately Protected By An
        Equity Cushion, The Continued Operation Of The Debtors' Businesses
        And Other Forms Of Adequate Protection. ......................................................... 21

III. PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THE MOTION
     HAVE BEEN SATISFIED ........................................................................... 24

IV. THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE.................................. 24

V. CONCLUSION ..................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Dynaco Corporation*,
 162 B.R. 389 (Bankr. D.N.H. 1993) ...............................................................................20, 22

*In re Immenhausen Corp.*,
 164 B.R. 347 (Bankr. M.D. Fla. 1994) ...................................................................................23

*In re McCombs Properties VI, Ltd.*,
 88 B.R. 261 (Bankr. C.D. Cal. l988).................................................................................21, 22

*In re Mellor*,
 734 F.2d 1396 (9th Cir. 1984) ................................................................................................21

*In re Newark Airport/Hotel Ltd. Partnership*,
 156 B.R. 444 (Bankr. D.N.J. 1993) ........................................................................................22

*In re O'Connor*,
 808 F.2d 1393 (10th Cir. 1987) ........................................................................................21, 23

*In re Oak Glen R-Vee*,
 8 B.R. 213 (Bankr. C.D. Cal. 1981) .......................................................................................20

*Matter of Pursuit Athletic Footwear, Inc.*,
 193 B.R. 713 (Bankr. D. Del. 1996) .......................................................................................22

*In re Stein*,
 19 B.R. 458. (Bankr. E.D. Pa. 1982) ......................................................................................22

*In re Triplett*,
 87 B.R. 25 (Bankr. W.D.Tex. 1988) .......................................................................................22

*In re Tucson Industrial Partners*,
 129 B.R. 614 (9th Cir. BAP 1991)..........................................................................................20

*United Savings Association v. Timbers of Inwood Forest Associates*,
 108 S.Ct. 626 (1988).................................................................................................................22

**Federal Statutes**

11 U.S.C. §§ 105(a), 361 and 363...................................................................................................2

11 U.S.C. § 363(a) ......................................................................................................................2, 3, 20

11 U.S.C. § 363(c)(1)...............................................................................................................19, 20

11 U. S.C. § 363(c)(2)(A) and (B) .................................................................................................20

11 U.S.C. § 363(c)(2)(B) ...................................................................................8, 20

11 U.S.C. § 506(c) ..............................................................................................8

11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549..............................................8

11 U.S.C. § 1107(a) ...........................................................................................20

Bankruptcy Code §§ 361(1) and (2) ..................................................................22

Bankruptcy Code § 363 ...............................................................................19, 20

Bankruptcy Code § 363(c)(2) ...............................................................20, 21, 24

Bankruptcy Code § 507(b)..........................................................................3, 7, 19

Bankruptcy Code §§ 1107 and 1108 ...................................................................3

**Other Authorities**

Bankruptcy Rule 4001 .........................................................................................8

Bankruptcy Rule 4001(b)(1)(B)........................................................................24

Bankruptcy Rule 6004 ............................................................................3, 10, 25

Bankruptcy Rules 4001 (b) ...............................................................................24

Federal Rules of Bankruptcy Procedure Rule 4001............................................3

Federal Rules of Bankruptcy Procedure Rule 4001(b)......................................24

Federal Rules of Bankruptcy Procedure Rules Rule 4001...................................2

Local Bankruptcy Rule 4001-2 ..........................................................................24

Local Bankruptcy Rule 4001-2(b) .......................................................................7

Pursuant to applicable Local Bankruptcy Rules, Rule 4001 of the Federal Rules of Bankruptcy Procedure, and 11 U.S.C. §§ 105(a), 361 and 363, TRX Holdco, LLC ("Hold Co") and Fitness Anywhere LLC, dba TRX and TRX Training ("Product Co" and together with Hold Co and Product Co, the "Debtors"), the debtors and debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases[1], hereby file this motion (the "Motion"), on an emergency basis, for the entry of an interim order ("Interim Order"), and for the entry of a final order ("Final Order" and with the Interim Order, the "Cash Collateral Orders") following a final hearing on the Motion, which provide for, among other things:

(1)    authorization for the Debtors' use of cash collateral, as such term is defined in 11 U.S.C. § 363(a), in order to: (a) pay quarterly fees to the United States Trustee and any required court costs;[2] (b) pay the expenses set forth in the Debtors' respective thirteen (13) week cash flow forecasts and cash collateral budgets setting forth all projected cash receipts and cash disbursements and the projected impacts on accounts receivables and inventory following the Petition Date (each, a "Budget", and together, the "Budgets"), true and correct copies of which are attached as **Exhibits 2, 3 and 4** to the Declaration of James S. Feltman filed concurrently herewith ("Feltman Declaration")[3], and all future budgets; (c) purchase inventory as needed to ensure that the Debtors do not suffer irreparable harm[4]; and (d) in accordance with the terms and conditions set forth in this Motion, as applicable;

(2)    the grant of adequate protection to Woodforest National Bank (the "Bank")[5] on account of the Bank's interest in the Debtors' cash collateral (a "Cash Collateral Creditor") on

---

[1] Concurrently herewith, the Debtors have filed a motion seeking to have their bankruptcy cases jointly administered.

[2] The Debtors have not included any actual figures in the Budgets for United States Trustee quarterly fees or required court costs, but seek authority to pay such fees and costs using cash collateral.

[3] The Debtors have prepared a Budget for Product Co (Exhibit 2), a Budget for Hold Co (Exhibit 3), and a consolidated Budget (Exhibit 4).

[4] The Debtors have not included in the Budgets any additional purchases of inventory but request authority to do so in the ordinary course of business to the extent sufficient funds exist in order for the Debtors to do so.

[5] The Debtors are not aware of any other creditor that has an interest in the Debtors' cash collateral and no other creditor appears on the Debtors' recent UCC searches.

account of the Debtors' use of cash collateral as defined in 11 U.S.C. § 363(a), which adequate protection shall be in the form of (a) a replacement lien against the Debtors' post-petition assets (excluding any avoidance causes of action), to the extent of any post-petition diminution in the value of the Bank's collateral as a result of the Debtors' use of cash collateral; and (b) a super priority administrative claim pursuant to Section 507(b) of the Bankruptcy Code to the extent of any post-petition diminution in the value of the Bank's prepetition collateral as a result of the Debtors' use of cash collateral.

(3)    pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of the Interim Order, which, among other things, (i) authorizes the Debtors' use of the cash collateral; and (iii) grants the Adequate Protection Liens and claims described above;

(4)    the scheduling of a final hearing (the "Final Hearing") on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(5)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of the Interim Order.

**BACKGROUND INFORMATION**

On June 8, 2022, the Debtors each filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have operated their businesses and managed their affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtors and their respective subsidiaries (collectively referred to herein as "TRX") comprise a world leading functional fitness company.  Since being founded in 2004, TRX has evolved into a digitally-enabled, vertically integrated, omni-channel fitness lifestyle brand with global reach powered by a large community of consumer and trainer enthusiasts.[6]   TRX's

---

[6] Hold Co holds a preferential and controlling interest in Product Co.  Hold Co also wholly owns TRXperience, LLC ("Experience Co").  Experience Co has not filed a bankruptcy case.  Product Co wholly owns Fitness Anywhere International LLC (100% by Product Co) and Fitness

flagship and patented product - Suspension Trainer™ - is a highly versatile, portable, compact and affordable fitness and training device/workout tool with broad reach across demographic groups and fitness levels, which can be utilized effectively across fitness modalities. TRX offers a full line of functional training tools and accessories to complement the Suspension Trainer™ to serve all types of functional needs, from at-home essentials to complete gym installations. TRX also launched in 2021 a purpose-built digital subscription-based platform - the TRX Training Club® - that offers a library of on-demand videos and daily live classes.

As discussed in further detail below, it became apparent in late 2021 that the Debtors would require additional capital to fund the Debtors' long-term operations and growth, and satisfy the Debtors' secured debt obligations owed to Woodforest National Bank (the "Bank") of more than $19 million[7] and unsecured debt obligations in the current estimated amount of approximately $17,000,000.

Pre-petition, the Debtors hired Kroll Securities, LLC ("Kroll") and Integrity Square LLC to, among other things, identify prospective investors and seek to obtain additional investments in the Debtors' business to further capitalize the Debtors and meet the Debtors' operational and growth needs, or engage in a sale transaction. The Debtors' pre-petition efforts to raise capital to pay down debt or engage in a strategic merger/acquisition with/by a buyer or investor did not result in a consummated transaction. The Debtors believe that timing and macroeconomic considerations both played a role in the Debtors not consummating a pre-petition transaction. For example, while various parties expressed interest in a transaction with the Debtors, those who signed nondisclosure agreements and engaged in discussions with the Debtors did not

---

Anywhere Europe Cooperatief U.A. Netherlands (99% by Product Co and 1% by Fitness Anywhere International LLC), none of which have filed a bankruptcy case.

[7] Product Co and the Bank are parties to a Credit Agreement, dated as of December 26, 2018, as amended, pursuant to which Product Co obtained from the Bank a term loan in the principal amount of $10,875,000, a term loan in the principal amount of $1,000,000, and revolving loans in the principal and outstanding amount of $7,500,000, for a total principal balance of $19,375,000, which are secured by substantially all assets of the Debtors, and which are guaranteed by Hold Co, Experience Co and Fitness Anywhere International, LLC.

ultimately proceed with engaging in a transaction.  The Debtors also explored potential financing arrangements and received various expressions of interest.[8]

The Debtors' current financial situation is precarious in that the Debtors estimate that unless they can consummate a transaction or obtain additional financing the Debtors will not have sufficient liquidity to replenish inventory, impairing future customer sales and thereafter negatively impacting the Company's good will.  The Debtors believe that if there was a shutdown of their business with a resulting liquidation, it would be a disastrous result for creditors, including the Bank.

Despite these challenges, the Debtors believes that (i) the TRX brand is well-regarded and its products and services have significant demand; (ii) TRX has a compelling business model with growth opportunities; (iii) TRX is well-positioned to capitalize on growth in the fitness industry; and (iv) the Debtors' business is extremely valuable, especially when considering its substantial intellectual property portfolio that enables the Debtors to protect it against imitators of its famous Suspension Trainer™ product and the significant goodwill it has amassed with its consumers and qualified TRX trainers throughout its history.  Moreover, the pre-petition marketing process undertaken by Kroll and Integrity Square was designed to result in a recapitalization of the Debtors' business and was not marketed as a distressed free and clear asset sale.

Based on the foregoing, the Debtors determined in the exercise of their business judgment that the best option available to the Debtors would be to conduct an expedited free and clear asset sale in a chapter 11 bankruptcy proceeding and consummate that asset sale before the Debtors' inventory falls below required operational levels and the Debtors run out of sufficient liquidity to sustain operations.[9]  The Debtors believe that proceeding in this manner will afford

---

[8] It is possible that the Debtors will require debtor in possession financing if the Debtors' cash on hand and cash generated post-petition are not sufficient to meet all of the Debtors' operational needs during this chapter 11 case.  Additionally, in order for the Debtors to purchase any significant inventory going forward, the Debtors will require additional funding.

[9] While the Debtors' Budgets reflect that the Debtors are projected to have sufficient cash during the term of the Budgets to fund the expenses in the Budget, the Budgets do not include any additional purchases of inventory.

them with the best opportunity to achieve the maximum price possible for their assets for the benefit of their creditors and other parties in interest.  The Debtors are optimistic that this free and clear asset sale process will result in a successful sale transaction closing.  The Debtors believe that a free and clear sale of all of their assets should yield a sale price of at least $25 million and hopefully much more.

The Debtors goal in these bankruptcy cases is to consummate a free and clear asset sale for the most money possible.  The Debtors intend to file in the near future a motion seeking Court approval of proposed bidding and auction procedures.  The Debtors will be filing an application to retain Kroll (or an affiliate) to serve as the Debtors' post-petition financial advisor to assist the Debtors with the Debtors' financial affairs and as the Debtors' investment banker to run the Debtors' free and clear asset sale process.

The only way for the Debtors to continue to operate their business pending the consummation of a free and clear asset sale is for the Debtors to be able to use their cash collateral to pay their post-petition expenses in accordance with the Budgets.  The alternative to the Debtors' use of cash collateral would be an immediate shut down of the Debtors' business and termination of all employees, service providers and outsourced business operations, which the Debtors believe would be devastating to the value of the Debtors' assets and would result in an economic disaster for all creditors, including the Bank.

The Debtors are continuing to analyze, in consultation with Kroll, whether obtaining post-petition financing is necessary in order for the Debtors to have an adequate time period to conduct this free and clear asset sale process and to consummate an asset sale transaction.  If the Debtors conclude that obtaining such post-petition financing is necessary, a decision the Debtors expect to make in the coming days, the Debtors will be coming before this Court seeking Court approval of such post-petition financing.

///

///

## SUMMARY OF REQUEST TO USE CASH COLLATERAL

The Debtors seek an order of the Court authorizing the Debtors to use their cash collateral to pay all of their projected expenses set forth in the Budgets. The Debtors further seek Court authority to deviate from the Budgets, without the need for any further Court order, by up to 20% by line item and 25% in the aggregate without the need for any further Court order, and the Debtors seek Court authority to deviate further from the Budgets without the need for any further Court order provided the Debtors obtain the prior consent of the Bank.

As adequate protection for the Debtors' use of cash collateral, the Debtors propose to provide to the Bank a replacement lien against the Debtors' post-petition assets (excluding any avoidance causes of action), to the extent of any post-petition diminution in the value of the Bank's prepetition collateral as a result of the Debtors' use of cash collateral. Further, the Bank shall be granted a super priority administrative claim pursuant to Section 507(b) of the Bankruptcy Code to the extent of any post-petition diminution in the value of the Bank's prepetition collateral as a result of the Debtors' post-petition use of cash collateral.

Pursuant to Local Bankruptcy Rule 4001-2(b), the Debtors submit that this Motion does not contain any of the following provisions:

| **Provision** | **Paragraph** |
|---|---|
| Cross-collateralization clauses | None |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | None |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | None |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | None |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | None |

| Provision | Paragraph |
|---|---|
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | None |
| Waivers of avoidance actions arising under the Bankruptcy Code. | None |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | None |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the Debtor with respect to a professional fee carve out | None |
| Provisions that prime any secured lien | None |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | None |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | None |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | None |
| Waivers, effective on default or expiration, of the Debtors' right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | None |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | None |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | None |

Pursuant to Bankruptcy Rule 4001, while the Court cannot conduct a final hearing on the Motion earlier than 14 days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtors to use cash collateral as is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing. For the reasons noted above, to avoid immediate and irreparable harm to the Debtors' business and their bankruptcy estates, the Debtors must be able to use their cash collateral to pay

the expenses set forth in the Budgets pending a final hearing.  Specifically, the Debtors require immediate authority to use cash collateral to pay, among other things: (1) payroll in order to ensure that there is no interruption or interference in the Debtors' relationship with their employees[10] (provided that any insider compensation will be subject to compliance with insider compensation approval requirements); (2) key contractors, service providers, consultants and vendors, in order to ensure there is no interruption in critical services being provided to the Debtors and product being delivered to the Debtors; (3) logistics costs in order to ensure timely receipt and delivery of products relating to the E-commerce business; and (4) insurance and taxes.

The relief sought in this Motion is based upon this Motion, the annexed Memorandum of Points and Authorities, the Declarations of James S. Feltman, Brent Leffel, Joshua Benn and Krikor J. Meshefejian filed concurrently herewith, the statements, arguments and representations of counsel to be made at the hearing(s) on this Motion, and any other evidence properly presented to the Court at or prior to the hearing(s) on this Motion.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtors have served a copy of this Motion and all supportive papers (including notice of the hearing on the Motion) upon the Office of the United States Trustee, the Bank, the 20 largest unsecured creditors of each of the Debtors and parties requesting special notice via overnight mail.

///

///

///

///

///

---

[10] Particularly in today's competitive employment marketplace, and considering that the Debtors are seeking to engage in an expedited asset sale transaction, the loss of employees would have a significant negative impact upon the Debtors' business operations and asset sale process as the Debtors do not believe they would be well-positioned, nor would it be feasible from an operational standpoint, to find qualified new employees under these circumstances.

**WHEREFORE**, the Debtors respectfully request that this Court enter an order:

(1)     granting the relief requested in this Motion on an interim basis pending a Final Hearing;

(2)     waiving any applicable stay, including the stay provided under Bankruptcy Rule 6004, to allow the Interim Order to become immediately effective;

(3)     scheduling the Final Hearing on this Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in this Motion on a final basis; and

(4)     granting such further relief as the Court deems just and proper.

Dated:  June 8, 2022

TRX HOLDCO, LLC
FITNESS ANYWHERE LLC

By:_____/s/ Ron Bender_____
     RON BENDER
     KRIKOR J. MESHEFEJIAN
     LINDSEY L. SMITH
     LEVENE, NEALE, BENDER,
     YOO & GOLUBCHIK L.L.P.
     Proposed Attorneys for Chapter 11 Debtors
     and Debtors in Possession

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.**

3

**STATEMENT OF FACTS**

4

**A.    Brief Description Of The Debtors And Their Business.**

5

     1.     The Debtors and their respective subsidiaries (collectively referred to herein as

6

"TRX") comprise a world leading functional fitness company.  Since being founded in 2004,

7

TRX has evolved into a digitally-enabled, vertically integrated, omni-channel fitness lifestyle

8

brand with global reach powered by a large community of consumer and trainer enthusiasts.[11]

9

TRX's flagship and patented product - Suspension Trainer™ - is a highly versatile, portable,

10

compact and affordable fitness and training device/workout tool with broad reach across

11

demographic groups and fitness levels, which can be utilized effectively across fitness

12

modalities.  TRX offers a full line of functional training tools and accessories to complement the

13

Suspension Trainer™ to serve all types of functional needs, from at-home essentials to complete

14

gym installations.   TRX also launched in 2021 a purpose-built digital subscription-based

15

platform - the TRX Training Club® - that offers a library of on-demand video and daily live

16

classes.

17

     2.     TRX enjoys a strong origin story (the first version of the Suspension Trainer™

18

was created in 1997 by Randy Hetrick, the founder of TRX), significant brand recognition and

19

intellectual property protections around its flagship product Suspension Trainer™, which is

20

distributed in over thirty (30) countries through commercial channels (gyms and vertical

21

markets) and consumer markets (including through its direct-to-consumer platform

22

www.TRXtraining.com in the United States and United Kingdom, Amazon, and other retailers).

23

     3.     From 2004 through 2013, Mr. Hetrick launched and commercialized TRX,

24

building a loyal community of trainers and market penetration in gyms.  From 2014 to 2018, the

25

_____

26

[11] Hold Co holds a preferential and controlling interest in Product Co.  Hold Co also wholly owns TRXperience, LLC ("Experience Co").  Experience Co has not filed a bankruptcy case.

27

Product Co wholly owns Fitness Anywhere International LLC (100% by Product Co) and Fitness Anywhere Europe Cooperatief U.A. Netherlands (99% by Product Co and 1% by Fitness

28

Anywhere International LLC), none of which have filed a bankruptcy case.

TRX business matured after receiving a growth capital investment.  In late 2018, an investor group led by Equity 38, LLC acquired the business in a highly structured transaction which included a credit facility with Woodforest National Bank (the "<u>Bank</u>") alongside an equity investment and rollover investment from the previous investors, and, in 2019, various operational improvement initiatives were implemented to restructure the business.  By the end of 2019, the business required a capital infusion to reset its credit facility with the Bank and also secure operating capital to execute on a strategy which incorporated the pursuit of digital initiatives to broaden the company's revenue opportunities beyond sales of its flagship product.

4.    In March 2020, Hold Co was formed and additional equity capital was invested by existing and new investors in a further recapitalization of TRX.  A portion of such proceeds were invested in Product Co to repay senior debt and provide working capital financing, and the balance remained at Hold Co to fund growth initiatives such as digital.  After giving effect to the March 2020 recapitalization, Hold Co held a preferential and controlling interest in Product Co, and also became a guarantor of the credit facility. Hold Co also owns 100% of the interests of Experience Co, an entity that was formed at the time of the recapitalization for purposes of housing TRX's digital platform services that were beginning to be developed and for its educational services and offerings through which TRX has qualified training professionals on suspension training/functional training techniques and programming.  While the different entities were established to allow for a segregation of the equity investment made in the recapitalization and to limit dilution to legacy shareholders, TRX has operated as one identifiable brand in the market, and through intercompany agreements, including a management services agreement between Hold Co and Product Co wherein Hold Co provides the services of executive management that oversee the entire TRX enterprise, it also effectively operates as a consolidated business.

5.    In 2019, the Debtors generated approximately $51 million in revenue.  In 2020, the Debtors formulated a digital strategy with outside consultants while experiencing COVID-driven revenue growth, to approximately $85 million.  In 2021, the Debtors executed and invested in a number of initiatives focused on digital and marketing, hiring executives in key

roles while building a significant inventory position and navigating through a rapidly changing macro environment, and generated approximately $62 million in sales.

**B.      Events Leading To Bankruptcies And The Debtors' Chapter 11 Goals.**

6.      Despite the development and success of the Debtors' products over the years, the Debtors' revenue and cash flow from operations has been insufficient to support their current business operations as well as their continued growth.  There have been many reasons for this including competition, macroeconomic conditions, purchases of inventory in anticipation of demand that did not occur in an unpredictable market, and higher than anticipated development costs associated with the Debtors' digital training platform and increased marketing expenses, partially attributable to general increases in paid advertising.  It became apparent in late 2021 that the Debtors would require additional cash and investment to fund the Debtors' long-term operations and growth and satisfy the Debtors' secured debt obligations owed to the Bank of more than $19 million.[12]

7.      Pre-petition, the Debtors hired Kroll Securities, LLC ("Kroll") and Integrity Square LLC to, among other things, identify prospective investors and seek to obtain additional investments in the Debtors' business to further capitalize the Debtors and meet the Debtors' operational and growth needs, or engage in a sale transaction.  The Debtors' pre-petition efforts to raise capital to pay down debt or engage in a strategic merger/acquisition with/by a buyer or investor did not result in a consummated transaction.

8.      The Debtors believe that timing and macroeconomic considerations both played a role in the Debtors not consummating a pre-petition transaction.  For example, while various parties expressed interest in a transaction with the Debtors, those who signed nondisclosure agreements and engaged in discussions with the Debtors did not ultimately proceed with

---

[12] Product Co and the Bank are parties to a Credit Agreement, dated as of December 26, 2018, as amended, pursuant to which Product Co obtained from the Bank a term loan in the principal amount of $10,875,000, a term loan in the principal amount of $1,000,000, and revolving loans in the principal and outstanding amount of $7,500,000, for a total principal balance of $19,375,000, which are secured by substantially all assets of the Debtors, and which are guaranteed by Hold Co, Experience Co and Fitness Anywhere International, LLC.

engaging in a transaction.  The Debtors also explored potential financing arrangements and received various expressions of interest.[13]

9.     The Debtors' current financial situation is precarious in that the Debtors estimate that unless they can consummate a transaction or obtain additional financing, the Debtors will not have sufficient liquidity to replenish inventory, impairing future customer sales and thereafter negatively impacting the Debtors' goodwill.  The Debtors believe that if there was a shutdown of their business with a resulting liquidation, it would be a disastrous result for creditors, including the Bank.

10.    Despite these challenges, the Debtors believes that (i) the TRX brand is well-regarded and its products and services have significant demand; (ii) TRX has a compelling business model with significant growth opportunities; (iii) TRX is well-positioned to capitalize on growth in the fitness industry; and (iv) the Debtors' business is extremely valuable especially when considering its substantial intellectual property portfolio that enables the Debtors to protect it against imitators of its famous Suspension Trainer™ product and the significant goodwill it has amassed with its consumers and qualified TRX trainers throughout its history.  Moreover, the pre-petition marketing process undertaken by Kroll and Integrity Square was designed to result in a recapitalization of the Debtors' business and was not marketed as a distressed free and clear asset sale.

11.    Based on the foregoing, the Debtors determined in the exercise of their business judgment that the best option available to the Debtors would be to conduct an expedited free and clear asset sale in a chapter 11 bankruptcy proceeding and consummate that asset sale before the Debtors' inventory falls below required operational levels and the Debtors run out of sufficient liquidity to sustain operations.[14]   The Debtors believe that proceeding in this manner will afford

---

[13] It is possible that the Debtors will require debtor in possession financing if the Debtors' cash on hand and cash generated post-petition are not sufficient to meet all of the Debtors' operational needs during this chapter 11 case.  Additionally, in order for the Debtors to purchase any significant inventory going forward, the Debtors will require additional funding.

[14] While the Debtors' Budgets reflect that the Debtors are projected to have sufficient cash during the term of the Budgets to fund the expenses in the Budgets, the Budgets do not include any additional purchases of inventory.

them with the best opportunity to achieve the maximum price possible for their assets for the benefit of their creditors and other parties in interest.  The Debtors are optimistic that this free and clear asset sale process will result in a successful sale transaction closing.  The Debtors believe that a free and clear sale of all of their assets should yield a sale price of at least $25 million and hopefully much more.

12.    The Debtors goal in these bankruptcy cases is to consummate a free and clear asset sale for the most money possible.  The Debtors intend to file in the near future a motion seeking Court approval of proposed bidding and auction procedures.  The Debtors will be filing an application to retain Kroll (or an affiliate) to serve as the Debtors' post-petition financial advisor to assist the Debtors with the Debtors' financial affairs and as the Debtors' investment banker to run the Debtors' free and clear asset sale process.

13.    The only way for the Debtors to continue to operate their business pending the consummation of a free and clear asset sale is for the Debtors to be able to use their cash collateral to pay their post-petition expenses in accordance with the Budgets (defined and discussed below).  The alternative to the Debtors' use of cash collateral would be an immediate shut down of the Debtors' business and termination of all employees, service providers and outsourced business operations, which the Debtors believe would be devastating to the value of the Debtors' assets and would result in an economic disaster for all creditors, including the Bank.

14.    The Debtors are continuing to analyze, in consultation with Kroll, whether obtaining post-petition financing is necessary in order for the Debtors to have an adequate time period to conduct this free and clear asset sale process and to consummate an asset sale transaction.  If the Debtors conclude that obtaining such post-petition financing is necessary, a decision the Debtors expect to make in the coming days, the Debtors will be coming before this Court seeking Court approval of such post-petition financing.

**C.    The Debtors' Primary Assets and Secured Loans.**

15.    The Debtors' primary assets are comprised of accounts receivable in the approximate gross amount of $5.1 million as of the Petition Date, inventory with a cost basis of approximately $17.8 million as of the Petition Date, intellectual property and goodwill associated with the Debtors' well-regarded brand, and the Debtors' vast domestic and international customer base.

16.    To support the financial needs of their growth and operations, on or about December 26, 2018, the Debtors (with Product Co as borrower and Hold Co ultimately as one of three guarantors[15]) obtained a senior secured credit facility revolving credit facility from the Bank, secured by substantially all of the Debtors' assets and property.  The credit facility is evidenced by that certain "Credit Agreement Dated as of December 26, 2018" as amended from time to time, in the original principal amount of $20,000,000.  Based on five amendments to the Credit Agreement, the credit facility is currently comprised of a term loan with a principal balance of $10,875,000, a term loan with a principal balance of $1,000,000, and revolving loans up to $8,000,000 with a principal balance of $7,500,000. As of the Petition Date, the total principal balance of the loans made by the Bank to the Debtors is approximately $19,375,000.

17.    The Bank recorded with the Delaware Secretary of State a UCC-1 financing statement on December 26, 2018 (filing number 2018 8982163) listing Product Co as debtor, and a UCC-1 financing statement on March 19, 2021 (document number 2021 2186741) listing Hold Co as debtor, which together provide that the Bank asserts a lien against substantially all of the Debtors' assets and property.  *See* **Exhibits A and B** attached to the Declaration of Krikor J. Meshefejian ("Meshefejian Declaration") filed concurrently herewith.

18.    On May 16, 2022, the Bank and Product Co entered into that certain "First Forbearance Agreement And Fifth Amendment To Credit Agreement" which set forth various

---

[15] The other two guarantors are Experience Co (a wholly owned subsidiary of Hold Co) and Fitness Anywhere International, LLC (a wholly owned subsidiary of Product Co).  Hold Co and Experience Co became guarantors in connection with a recapitalization of TRX completed in 2020.

"Events of Default" and agreement by the Bank to forbear from exercising certain of its default-related rights and remedies.

19.    The Debtors have engaged in discussions with the Bank regarding, among other things, the Debtors' cash flow challenges and needs, these bankruptcy cases, and the Debtors' imminent need for additional funding to enable the Debtors to have a sufficient amount of time to run a free and clear asset sale process designed to achieve the highest and best price for the Debtors' assets.  The Debtors are hopeful that they will be able to obtain the Bank's consent regarding the Debtors' use of cash collateral, and have also approached the Bank to determine whether the Bank is willing to lend additional funds to the Debtors post-petition and, if not, whether the Bank is willing to subordinate to a new lender.

20.    The Debtors have no secured creditors other than the Bank.  Attached as **Exhibits A and B** to the Meshefejian Declaration are copies of the certified searches of recorded UCC-1 financing statements from the Delaware Secretary of State with respect to Product Co and Hold Co, respectively.  Attached as **Exhibits C and D** to the Meshefejian Declaration are copies of certified searches of recorded UCC-1 financing statement from the California Secretary of State with respect to Product Co and Hold Co, respectively.

**D.    The Debtors' Urgent Need For Use Of Cash Collateral.**

21.    In order for the Debtors to have the opportunity to attempt to consummate a sale of their business/assets, the Debtors must be able to continue to operate their business, and the only way for the Debtors to be able to continue to operate their business is for the Debtor to have use of their cash collateral to pay for their post-petition operating expenses.  Without the use of their cash collateral, the Debtors would be forced to immediately shut down and close their business and terminate all of their employees.  There would be no doubt that doing so would be a disastrous result for the Debtors' creditors and other parties in interest, including the Bank.  That would make no sense.

22.    Attached as **Exhibits 2, 3 and 4** to the Declaration of James S. Feltman ("Feltman Declaration") are the Debtors' thirteen (13) week cash flow forecasts and cash collateral budgets setting forth all projected cash receipts and cash disbursements and the projected impacts on

accounts receivables and inventory following the Petition Date (each, a "Budget" and together, the "Budgets").[16]  As set forth therein, the Debtors require immediate authority to use cash collateral to pay, among other things: (1) payroll in order to ensure that there is no interruption or interference in the Debtors' relationship with their employees (provided that any insider compensation will be subject to compliance with insider compensation approval requirements); (2) key contractors, service providers, consultants and vendors, in order to ensure there is no interruption in critical services being provided to the Debtors and product being delivered to the Debtors; (3) logistics costs in order to ensure timely receipt and delivery of products relating to the E-commerce business; and (4) insurance and taxes.

23.    The Debtors have not included in the Budgets any additional purchases of inventory but request authority pursuant to this Motion to do so in the ordinary course of business to the extent sufficient funds exist in order for the Debtors to do so, including during the interim period of approval of this Motion, to the extent necessary to avoid irreparable and immediate harm.

24.    The Budgets incorporate all of the projected cash receipts and cash disbursements of the entire business operations of the Debtors and their respective subsidiaries.  As described above, Hold Co holds a preferential and controlling interest in Product Co and wholly owns Experience Co (which accounts for the Debtors' digital subscription-based training platform). Product Co operates, manages and accounts for the TRX product lines such as the Suspension Trainer™, including internationally by and through Fitness Anywhere International, LLC, Fitness Anywhere Europe Cooperatief U.A. Netherlands, TRX Training Japan Co., LTD. and Fitness Anywhere UK Limited.  Additionally, as described above, the different entities were established to allow for a segregation of the equity investment made in the recapitalization, but TRX has operated as one identifiable brand in the market, and through intercompany agreements, including a management services agreement between Hold Co and Product Co

---

[16] The Debtors have prepared a Budget for Product Co (Exhibit 2), a Budget for Hold Co (Exhibit 3), and a consolidated Budget (Exhibit 4).

wherein Hold Co provides the services of executive management that oversee the entire TRX enterprise[17], it also effectively operates as a consolidated business.

25.     The Debtors seek an order of the Court authorizing the Debtors to use their cash collateral to pay all of their projected post-petition expenses set forth in the Budgets.   The Debtors further seek Court authority to deviate from the Budgets, without the need for any further Court order, by up to 20% by line item and 25% in the aggregate without the need for any further Court order, and the Debtors seek Court authority to deviate further from the Budgets without the need for any further Court order provided the Debtors obtain the prior consent of the Bank, since the Bank is the only entity with an interest in the Debtors' cash collateral.

26.     As adequate protection for the Debtors' use of cash collateral, the Debtors propose to provide to the Bank a replacement lien against the Debtors' post-petition assets (excluding any avoidance causes of action), to the extent of any post-petition diminution in the value of the Bank's prepetition collateral as a result of the Debtors' post-petition use of cash collateral.   Further, the Bank shall be granted a super priority administrative claim pursuant to Section 507(b) of the Bankruptcy Code to the extent of any post-petition diminution in the value of the Bank's prepetition collateral as a result of the Debtors' post-petition use of cash collateral.

## II.

## THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

**A.     The Debtors Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve Their Assets In Accordance With The Budgets.**

The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code.   Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of

---

[17] Product Co pays to Hold Co the funds necessary to pay Hold Co's payroll, and Product Co pays for certain of the expenses of Product Co's subsidiaries (located in Japan and the United Kingdom), as set forth in the Budgets.  Hold Co also collects and utilizes the revenue of Hold Co's wholly owned subsidiary Experience Co.

> property of the estate, in the ordinary course of business, without
> notice or a hearing, and may use property of the estate in the ordinary
> course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363. 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]" 11 U.S.C. § 363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)    each entity that has an interest in such cash collateral
> consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale
> or lease in accordance with the provisions of this section.

11 U. S. C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

For the reasons discussed herein, the Debtors have no ability to maintain their business operations or to preserve the going-concern value of their assets unless the Debtors have the ability to use cash collateral to pay their projected expenses in accordance with the Budgets. The Debtors' inability to pay such expenses would cause immediate and irreparable harm to the Debtors' bankruptcy estates. Indeed, the Debtors' inability to pay the expenses set forth in the Budgets, which includes payroll, logistics, insurance, taxes and other critical operating expenses,

would result in the immediate shutdown of the Debtors' business and the decimation of the going-concern value of the Debtors' business and assets.  The preservation and maintenance of the value of the Debtors' businesses and assets are of the utmost significance and importance to a successful sale of substantially all of the Debtors' assets and the Debtors' emergence from these Chapter 11 cases.

**B.**     **The Sole Pre-Petition Secured Party Is Adequately Protected By An Equity Cushion, The Continued Operation Of The Debtors' Businesses And Other Forms Of Adequate Protection.**

As noted above, the Bank is the only party who has an interest in the Debtors' cash collateral.

Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected.  *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").  The Debtors are hopeful that the Bank will consent to the Debtors' use of cash collateral.  The Debtors are in discussions with the Bank.  Given the exigency of the circumstances here, the Debtors did not have the time to attempt to negotiate a cash collateral stipulation with the Bank so the Debtors proceeded to file this Motion in the hope of obtaining a consensual interim order and then hopefully reach a more long-term agreement with the Bank, that hopefully would include some form of debtor-in-possession financing, with such debtor-in-possession financing either provided by the Bank or by a new lender with the consent of the Bank.  While the Debtors would prefer not to seek debtor-in-possession financing over the Bank's objection, the Debtors will proceed to do so if the Debtors conclude that doing so would be in the best interests of their estates.

If for whatever reason, the Bank refuses to consent to the Debtors' use of cash collateral, the Debtors submit that the Court should authorize the Debtors to use their cash collateral without the consent of the Debtors because the Bank's interest in the Debtors' cash collateral will be adequately protected by, among other things, an equity cushion and the continued

operation and maintenance of the Debtors' business which the Debtors believe has a total value well in excess of the total indebtedness to the Bank, particularly if the Debtors are provided with an adequate opportunity for Kroll to market the free and clear sale of the Debtors' assets to maximize their value (which may require the Debtors to obtain additional financing).

Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim. 108 S.Ct. at 630. *See also, McCombs,* 88 B.R. at 266. Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." *McCombs*, 88 B.R. at 266. The law is clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988). *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982). The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also, In re McCombs*, *supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budgets, the payment of the expenses necessary for the Debtors to continue operating their businesses will adequately protect the Bank because by doing so, the Debtors will continue to generate revenue and will be able to preserve the going-concern value of the Debtors' assets while the Debtors pursue a free and clear asset sale designed to achieve the highest price possible for the Debtors' assets. Other courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R.

389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, courts have stressed the importance of promoting a debtor's reorganization.  In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The Debtors' use of cash collateral is critical to the Debtors' ability to maintain their business operations and preserve the value of their assets while the Debtors pursue a free and clear sale of the Debtors' assets for the benefit of the Debtors' estates.  If the Debtors are not permitted to use cash collateral to maintain the Debtors' business operations and preserve the going-concern value of the Debtors' assets, the Debtors would be forced to shut down immediately and terminate all of their employees.  That would result in an economic disaster for all creditors, including the Bank, and of course for the Debtors' employees, suppliers, etc.  In contrast, if the Debtors are authorized to use their cash collateral, the Debtors will be able to maintain business operations and preserve the value of the Debtors' assets while the Debtors pursue the successful consummation of a free and clear asset sale transaction for the benefit of the Debtors' creditors and estates, including first and foremost the Bank.  Clearly, the Debtors' use of cash collateral is both necessary and appropriate.

The Debtors further submit that the Bank, as the only creditor who has a security interest in and lien against the Debtors' assets including cash collateral, is further adequately protected by the Adequate Protection Liens and super-priority claims proposed to be provided to the Bank with the same extent, validity and priority as the Bank's pre-petition liens against the Debtors'

assets.

The Debtors therefore submit that the requirements of section 363(c)(2) have been satisfied and that the Debtors should be authorized to use cash collateral in accordance with this Motion.

### III.

### PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF

### THE MOTION HAVE BEEN SATISFIED

Rule 4001(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") sets forth the procedural requirements for obtaining authority to use cash collateral. The Debtors submit that they have complied with these procedural requirements. First, the Motion must provide a concise statement of the relief requested, which was done above. Second, the Motion is required to be served on any entity with an interest in the Debtors' cash collateral, any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs. Here, the Debtors have served the Motion and all supportive papers upon the Office of the United States Trustee, the Bank, the twenty largest unsecured creditors of each of the Debtors (as no committee yet exists), and all parties who have requested special notice via overnight mail. Accordingly, the Motion complies with the procedural requirements of Bankruptcy Rules 4001 (b).

In addition, in compliance with Bankruptcy Rule 4001(b)(1)(B)) and Local Bankruptcy Rule 4001-2, the Debtors have filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral) which discloses whether the proposed order authorizing the Debtors' use of cash collateral on an interim basis, pending a final hearing, contains certain provisions of findings of fact. Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

### IV.

### THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE

For the reasons noted in the Motion, the Debtors will suffer immediate and irreparable harm if the Debtors are not able to pay the expenses set forth in the Budgets, pending a final

hearing on the Motion.  Based on the foregoing, the Debtors request that any applicable stay, including the stay provided under Bankruptcy Rule 6004, be waived to allow the Interim Order to become immediately effective.

**V.**

**CONCLUSION**

Based upon all of the foregoing, the Debtors respectfully request that this Court enter an order:

(1)     granting the relief requested in the Motion on an interim basis;

(2)     waiving any applicable stay, including the stay provided under Bankruptcy Rule 6004, to allow the Interim Order to become immediately effective;

(3)     scheduling the Final Hearing on the Motion no later than the twenty-first (21st) day following the entry of the Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(4)     granting such further relief as the Court deems just and proper.

Dated:  June 8, 2022                    TRX HOLDCO, LLC
                                        FITNESS ANYWHERE LLC


                                        By:___*/s/ Ron Bender*_____
                                            RON BENDER
                                            KRIKOR J. MESHEFEJIAN
                                            LINDSEY L. SMITH
                                            LEVENE, NEALE, BENDER,
                                            YOO & GOLUBCHIK L.L.P.
                                            Proposed Attorneys for Chapter 11 Debtors
                                            and Debtors in Possession

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled (*specify*): **DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER: (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 361, 362 AND 363; (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b); AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_June 8, 2022_**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Michael J Hauser    michael.hauser@usdoj.gov**
- **Marsha A Houston    mhouston@reedsmith.com, hvalencia@reedsmith.com**
- **Christopher O Rivas    crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com**
- **Lindsey L Smith    lls@lnbyg.com, lls@ecf.inforuptcy.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) **_June 8, 2022_**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **_June 8, 2022_**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Honorable Scott C. Clarkson
U.S. Bankruptcy Court, Ronald Reagan Federal Building
411 West Fourth Street
Suite 5130
Santa Ana, CA 92701-4593

☐ Service information **BY OVERNIGHT MAIL** continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 8, 2022 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**