RON BENDER (SBN 143364)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: RB@LNBYG.COM; KJM@LNBYG.COM; LLS@LNBYG.COM

Attorneys for Chapter 11 Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>TRX HOLDCO, LLC, a Delaware limited liability company,<br><br>       Debtor and Debtor in Possession. | Lead Case No.: 8:22-bk-10948-SC<br><br>Jointly administered with:<br>8:22-bk-10949-SC<br><br>Chapter 11 Cases |
| In re:<br><br>FITNESS ANYWHERE LLC, a Delaware limited liability company, dba TRX and TRX Training,<br><br>       Debtor and Debtor in Possession. | **NOTICE OF SUBMISSION OF ASSET PURCHASE AGREEMENT**<br><br>[No Hearing Required] |
| ☒ Affects both Debtors<br><br>☐ Affects TRX Holdco, LLC only<br><br>☐ Affects Fitness Anywhere, LLC only | |

An auction sale was conducted on August 17, 2022, in the chapter 11 bankruptcy cases of TRX Holdco, LLC and Fitness Anywhere LLC, dba TRX and TRX Training, the debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Debtors").  The winning bidder at the auction sale was JFXD Capital, LLC, a Florida limited liability company ("Buyer").  Attached hereto is the form of Asset Purchase Agreement that is substantially in conformance of what the Debtors expect to be the final version of the Asset Purchase Agreement to be entered into between the Debtors and the Buyer.


Dated:  August 24, 2022                    TRX HOLDCO, LLC
                                           FITNESS ANYWHERE LLC

                                           By:___/s/ Ron Bender_____
                                                RON BENDER
                                                KRIKOR J. MESHEFEJIAN
                                                LINDSEY L. SMITH
                                                LEVENE, NEALE, BENDER,
                                                YOO & GOLUBCHIK L.L.P.
                                                Attorneys for Chapter 11 Debtors and
                                                Debtors in Possession

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made as of August ___, 2022, by and between JFXD Capital, LLC, a Florida limited liability company ("Buyer"), and TRX Holdco, LLC, a Delaware limited liability company ("Holdco") and Fitness Anywhere LLC, a Delaware limited liability company dba TRX and TRX Training ("Fitness Anywhere" and together with Holdco, "Sellers").  Certain other capitalized terms used in this Agreement are defined in Exhibit A attached hereto.  Buyer and Sellers are collectively defined herein as the "Parties" and singularly as a "Party".

## R E C I T A L S :

WHEREAS, Sellers together with the Subsidiary Group design, market, distribute and sell functional fitness equipment and related products and services (the "Business"); and

WHEREAS, on June 8, 2022 (the "Petition Date"), Sellers filed voluntary petitions (the "Bankruptcy Cases") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), and were assigned Lead Case No.: 8:22-bk-10948-SC (for Holdco) being jointly administered with Case No.: 8:22-bk-10949-SC (for Fitness Anywhere).

WHEREAS, Buyer desires to purchase and Sellers desire to sell to Buyer the Purchased Assets, as defined below, subject to the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the terms, covenants, and conditions hereinafter set forth, the Parties agree as follows:

## ARTICLE I

## ASSETS BEING PURCHASED; ASSUMPTION OF LIABILITIES

**1.1    Purchased Assets.**  Subject to the terms and conditions of this Agreement, Buyer hereby agrees to purchase from Sellers, and Sellers hereby agree to sell, convey, transfer and assign to Buyer, on the Closing Date (as hereinafter defined), all of Sellers' right, title and interest in and to all of the assets of Sellers used in connection with the Business and which are identified below (the "Purchased Assets"), free and clear of all Encumbrances pursuant to Section 363 of the Bankruptcy Code, except as set forth in the Sale Order.  The Purchased Assets consist of the following:

(a)    All of Sellers' supplies, computers, printers, equipment, furniture, fixtures and other similar assets or tangible personal property owned by Sellers which are identified in the fixed asset schedule attached hereto as Schedule 1.1(a) (collectively, the "Fixed Assets");

(b)    All of Sellers' rights, title, interest and benefits under the Contracts that are listed in Schedule 1.1(b) attached hereto ("Assigned Contracts") that Buyer elects to have Sellers assume and assign to Buyer as more described below;

(c)    All advance payments, claims for refunds and deposits, and other prepaid items relating to the Purchased Assets or the Assumed Obligations, existing as of the Closing Date;

(d)    All of Sellers' accounts receivable related to the Business in respect of sales of the Business prior to the Closing, including those identified on <u>Schedule 1.1(d)</u> attached hereto and all schedules, records and other documentation related to such accounts receivable (collectively, "<u>Purchased AR</u>");

(e)    All of Sellers' books and records directly related to, or used in connection with, the conduct of the Business or pertaining to the Purchased Assets, regardless of the medium on which such information is stored or maintained including, without limitation, all customer and employment records, vendor information and records, business plans and strategies, financial and operational data and reports, marketing information and materials, login, username, and password information (including for computers, printers, equipment, software, systems, web sites, and for all accounts owned, controlled, or otherwise used in connection with the Business) all corporate seals, minute books, stock books, tax returns and other similar records relating to the corporate organizations of each member of the Subsidiary Group, and all employee related or employee benefit related files or records of (i) the employees of the Sellers hired by Buyer (whether on or after the Closing Date) and (ii) the employees of the Subsidiary Group;

(f)    To the extent transferable, all of Sellers' licenses, permits or other authorizations of governmental or regulatory entities that are required under any laws, rules and regulations applicable to or affecting the Business, which are set forth on <u>Schedule 1.1(f)</u>;

(g)    To the extent assignable, all of Sellers' leased real property, including any leasehold improvements thereon, identified in the leased real property schedule attached hereto as <u>Schedule 1.1(g)</u> that Buyer elects to have Sellers assume and assign to Buyer;

(h)    All of Sellers' inventory, a complete and accurate detailed list of which is set forth on <u>Schedule 1.1(h)</u> (collectively, the "<u>Purchased Inventory</u>") that does not become part of the Excluded Inventory;

(i)    All of Sellers' Intellectual Property Rights and all goodwill associated with such Intellectual Property Rights, including, without limitation, (i) the right to use, copy, modify, exploit, license, assign, convey and pledge the Intellectual Property Rights, (ii) the right to exclude others from using the Intellectual Property Rights, (iii) the right to sue others and collect damages for past, present and future infringement of the Intellectual Property Rights, (iv) the right to create derivatives of the Intellectual Property and retain full ownership thereof, and (v) the right to file and prosecute applications for registration, now pending or hereinafter initiated, to protect any rights in the Intellectual Property Rights, a detailed list of which is set forth on <u>Schedule 1.1(i)</u>;

(j)    All insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Obligations (as defined herein) prior to the Closing Date except for those set forth on <u>Schedule 1.1(j)</u> which shall be part of the Excluded Assets;

(k)    All of Sellers' claims and lawsuit rights (pending or not) against third parties relating to the Purchased Assets, whether choate or inchoate, known or unknown, contingent or non-contingent except for those set forth on <u>Schedule 1.1(k)</u> which shall be part of the Excluded Assets;

(l)    All of Sellers' customer lists and contact information, including those customers listed on <u>Schedule 1.1(l)</u>;

(m) All of the equity interests of TRXperience LLC, Fitness Anywhere International, LLC and Fitness Anywhere Europe Cooperative U.A. (collectively, the "Seller Subsidiaries") set forth on Schedule 1.1(m); and

(n)   All goodwill associated with the Business and the Purchased Assets.

1.2    **Excluded Assets.** Buyer shall not acquire, and Sellers shall retain, all of the following assets, properties and rights owned by Sellers (collectively, the "Excluded Assets"):

(a)   All Contracts of Sellers that are not Assigned Contracts or Designation Rights Assets, and after expiration of the Designation Rights Period, all Designation Rights Assets not deemed a Purchased Asset pursuant to this Agreement;

(b)   All notes receivable and any other debt instruments providing for money owing to Sellers;

(c)   All cash and cash equivalents of Sellers and all other items set forth on Schedule 1.2(c) which shall also be part of the Excluded Assets;

(d)   The corporate seals, minute books, stock books, tax returns and other similar records relating to Sellers' corporate organizations, and all employee related or employee benefit related files or records, in each case, except to the extent included in the Purchased Assets as set forth in Section 1.1(e);

(e)   Except as to the Purchased Assets, all insurance recovery rights of Sellers and all tax refunds owing to Sellers, including, but not limited to, those set forth on Schedule 1.2(e) which shall also be part of the Excluded Assets;

(f)   All rights to all claims, causes of action, choses in action, rights of recovery and rights of set-off (whether choate or inchoate, known or unknown, contingent or non-contingent) in favor of Sellers that are not included with Section 1.1(k) above,  all avoidance causes of action existing under any of sections 544-553, inclusive, of the Bankruptcy Code, and all claims and causes of action, either direct or derivative, that would expressly inure to the benefit of the creditors in these Bankruptcy Cases, including those claims against any former or current insiders, affiliates, officers or directors, and to the extent applicable insurance recoveries related to such claims (collectively, the "Estate Claims");

(g)   All inventory that is the subject of any possessory lien that Buyer elects not to be included as part of the Purchased Assets (collectively, the "Excluded Inventory"); and

(h)   All other assets identified in Schedule 1.2.

Subject to Section 1.5, Buyer shall have the right, exercisable in Buyer's sole discretion at any time prior to the date that is one (1) day prior to the Closing Date, to designate any one or more of Sellers' assets, properties, and rights as Excluded Assets or Designation Rights Assets; provided, however, that any exercise of such right shall not affect the Purchase Price. For the avoidance of doubt, Buyer shall not have the right to specify that any Contract and/or asset that is an Excluded Asset shall be treated as a Purchased Asset.

3

**1.3    Assumed Obligations.**  Buyer hereby agrees to assume and to pay when due all of the obligations of Sellers under the Assigned Contracts, including any costs of cure with respect to the Assigned Contracts (the "Cure Amounts," or with respect to an individual Assigned Contract, the "Cure Amount") in each case to the extent arising and relating to the period through the Closing Date, and all executory obligations of Sellers arising after the Closing Date under the Assigned Contracts (collectively, the "Assumed Obligations").  The Assumed Obligations shall include all obligations and liabilities arising out of any default of Sellers under any Assigned Contract, regardless of when such liability or obligation is asserted.

**1.4    Liabilities Not Being Assumed.**  Except for the Assumed Obligations, Sellers agree that Buyer shall not be obligated to assume or perform and is not assuming or performing any liabilities or obligations of Sellers, whether known or unknown, fixed or contingent, certain or uncertain, and regardless of when such liabilities or obligations may arise or may have arisen or when they are or were asserted.

**1.5    Designation Rights Assets.**

(a)    Buyer shall have the right, by written notice to Sellers no later than one (1) day prior to the Closing Date, to specify that any Contract and/or asset that is not an Excluded Asset (other than with respect to any employment Contracts which must be assumed and assigned to Buyer or rejected by Sellers effective as of the Closing Date), shall be held by Sellers (and, to the extent a Contract, not rejected pursuant to Section 365 of the Bankruptcy Code) (any such Contract or asset, including those Contracts set forth on Schedule 1.3 which Schedule 1.3 may be amended by Buyer at any time no later than one (1) day prior to the Closing Date (other than with respect to the addition of an Excluded Asset to Schedule 1.3) to treat such Contracts as Purchased Assets or Excluded Assets a "Designation Rights Asset") for the duration of the Designation Rights Period; provided, however, that, with respect to any such Designation Rights Asset, (i) Buyer shall be solely responsible to timely pay for all costs associated with the continuation by, and (to the extent such Designation Rights Asset is a Contract) ultimate assumption or rejection by, Sellers of such Designation Rights Asset for the period from the Closing through the end of the Designation Rights Period (such costs, "Continuation Costs")); (ii) all cash collected by Sellers in respect of such Designation Rights Asset shall be promptly delivered to Buyer; provided, however, that Sellers shall be entitled to deduct Continuation Costs from any cash collected by Sellers in respect of the Designation Rights Asset giving rise to such costs; and (iii) the foregoing shall not affect the validity of the transfer to Buyer of any other Purchased Asset that may be related to such Designation Rights Asset.

(b)    As to each Designation Rights Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Buyer during the Designation Rights Period requesting assumption and assignment of any Designation Rights Asset, Sellers shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code such Designation Rights Asset(s) set forth in an Assumption Notice.

(c)    As to each Designation Rights Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, a "Rejection Notice") from Buyer during the Designation Rights Period requesting rejection of any Designation Rights Asset, Sellers shall take all actions

required by the Sale Order or otherwise that are reasonably necessary to reject such Contract pursuant to section 365 of the Bankruptcy Code.

(d)    Sellers and Buyer agree and acknowledge that the covenants set forth in this Section 1.5 shall survive the Closing.

(e)    Notwithstanding anything in this Agreement to the contrary, (i) on the date any Designation Rights Asset is assumed and assigned to Buyer pursuant to this Section 1.5, such Designation Rights Asset shall be deemed a Purchased Asset (and, for the avoidance of doubt, in the event such Designation Rights Asset is a Contract, such Designation Rights Asset shall be deemed an Assigned Contract) for all purposes under this Agreement and no further consideration shall be required to be paid for any Designation Rights Asset that is assumed and assigned to Buyer, and (ii) Buyer shall not have the right to specify that any Contract and/or asset that is an Excluded Asset shall be treated as a Purchased Asset.

(f)    In the event the condition to Closing set forth in Section 8.8 is not satisfied, Buyer shall have the right in its sole discretion to designate the equity interests of one or more of the Seller Subsidiaries as an Excluded Asset and upon such election by Buyer, the condition set forth in Section 8.8 shall be deemed satisfied.

## ARTICLE II

## PURCHASE PRICE AND BANKRUPTCY MATTERS

2.1    **Purchase Price.**  As consideration for the sale to Buyer of the Purchased Assets and the assumption of the Assumed Obligations, Buyer shall pay to Sellers a cash payment of Eight Million Four Hundred Thousand Dollars ($8,400,000) by wire transfer of immediately available funds to an account designated by Sellers (the "Purchase Price").  The Purchase Price shall be paid as follows:

(a)    a $2,000,000 deposit (the "Deposit"), which Deposit  a segregated trust account by Sellers' bankruptcy counsel, Levene, Neale, Bender, Yoo & Golubchik L.L.P. ("LNBYG").  In connection with the Closing,  the entire Deposit shall become the property of the Sellers and shall be credited against the amount required to be paid by Buyer to the Sellers at Closing. If this Agreement is validly terminated by the Sellers in accordance with the terms of this Agreement prior to Closing pursuant to Section 11.1(d), then the Sellers and Buyer shall deliver a joint written instruction to LNBYG authorizing LNBYG  to release from the Escrow Account the entire Deposit, by wire transfer of immediately available funds to an account designated by Sellers, with such Deposit to be retained by the Sellers as the Sellers' sole and exclusive remedy as liquidated damages for any and all losses or damages of any nature against Buyer in respect of this Agreement or the transactions contemplated hereby. In all other circumstances, if this Agreement is validly terminated in accordance with the terms of this Agreement prior to Closing, then promptly and in any event no later than three (3) Business Days of such termination, the Sellers and Buyer shall deliver a joint written instruction to LNBYG authorizing  LNBYG to release the Deposit by wire transfer of immediately available funds to an account designated by Buyer.

(b)    the $6,400,000 balance of the Purchase Price shall be wire transferred to the Sellers' secured lender, Woodforest National Bank (the "Bank"), on the Closing Date in the manner directed by the Bank, provided that the Bankruptcy Court has entered an order approving the sale of the Purchased Assets to Buyer (the "Sale Order").  Subject to the entry of the Sale Order by the

Bankruptcy Court and satisfaction or waiver by Buyer of the conditions set forth in Article VIII, Buyer fails to consummate the Closing by the Outside Closing Date (unless Buyer and Sellers jointly agree to extend the Outside Closing Date), Buyer shall be deemed to have permanently forfeited the Deposit with Sellers as liquidated damages.

2.2    **Allocation of Purchase Price.**    The Purchase Price shall be allocated among the Purchased Assets and the Assumed Obligations, in the manner set forth in <u>Exhibit B</u> attached hereto (the "<u>Purchase Price Allocation</u>") within thirty (30) days after the Closing (such Purchase Price Allocation to be prepared by Buyer and approved by Sellers (such approval not to be unreasonably withheld)).    Each of the Parties, when reporting the transactions consummated hereunder in their respective tax returns, shall allocate the Purchase Price paid or received, as the case may be, in a manner that is consistent with the Purchase Price Allocation set forth in <u>Exhibit B</u> hereto.    Additionally, each of the Parties will comply with, and furnish the information required by Section 1060 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), and any regulations thereunder.

2.3    **Third Party Consents.**    Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign or transfer any governmental approval, permit or other Contract, including the Assigned Contracts, or any claim, right or benefit arising thereunder or resulting therefrom if an assignment or transfer or an attempt to make such an assignment or transfer without the consent of a third party would constitute a breach or violation thereof or affect adversely the rights of Buyer or Sellers, thereunder unless such assignment is approved by the Bankruptcy Court; and any transfer or assignment to Buyer by Sellers, as applicable, of any interest under any such governmental approval,  permit or Contract that requires the consent of a third party shall be made subject to such consent being obtained from the contracting party or approval being obtained from the Bankruptcy Court.  In the event that any such consent or approval is not obtained on or prior to the Closing Date, Sellers shall continue to use all commercially reasonable efforts (without paying any additional consideration to the other party to such governmental approval, permit or Contract regarding such asset or in connection with obtaining any approval or consent) to obtain any such approval or consent after the Closing Date as promptly as possible, and Sellers will cooperate with Buyer in any lawful and reasonable arrangement to provide that Buyer shall receive the interest of Sellers in the benefits under any such governmental approval,  permit or Contract. However, it shall be the sole responsibility of Buyer to satisfy the Bankruptcy Code requirements to enable Sellers to assign to Buyer any of the Assigned Contracts, including that it shall be Buyer's sole responsibility to pay any required cure amounts to the counter-party to any such Assigned Contracts and to demonstrate Buyer's adequate assurance of future performance, as required, with respect to all of the Assigned Contracts.

2.4    **Bankruptcy Matters.**

(a)    **Payment of Cure Costs Under Assigned Contracts.**    As promptly as practicable following the execution of this Agreement, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine an estimate of the amounts required to cure all defaults under each Assigned Contract so as to permit the assumption and assignment of each such Assigned Contract pursuant to Section 365 of the Bankruptcy Code (as ultimately determined by the Bankruptcy Court, the "<u>Cure Costs</u>").  In connection with the assignment and assumption of the Assigned Contracts, Buyer shall pay all Cure Costs on or before the Closing. With respect to each of the Assigned Contracts assigned to Buyer during the Designation Rights Period, Buyer shall pay promptly after entry of order approving assumption and assignment of a Contract designated in accordance with Section 1.5 all amounts necessary to cure any monetary Default (as distinct from

curing all Defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money) that are required to be paid pursuant to section 365 of the Bankruptcy Code in order to assume and assign the Assigned Contracts to Buyer. Buyer shall be financially responsible for, and shall timely pay for, all costs, expenses and obligations arising during the Designation Rights Period under all Contracts that are not assumed or rejected as of the Closing Date until such time that the Bankruptcy Court enters an order providing for Sellers' assumption and assignment to Buyer of such Contracts or Sellers' rejection of such Contracts.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Subject to the disclosures and exceptions set forth in the disclosure schedules attached hereto (the "Sellers' Disclosure Schedules"), Sellers hereby make the representations and warranties set forth hereinafter in this Section 3 to Buyer:

**3.1    Authority and Binding Effect**. Subject to the approval of the Bankruptcy Court, Sellers have the full corporate power and authority to execute and deliver this Agreement and the Bill of Sale (as hereinafter defined). This Agreement, the Bill of Sale and the consummation by Sellers of their obligations contained herein and therein have been duly authorized by all necessary corporate actions of Sellers (and to the extent applicable, the members of the Subsidiary Group) and such agreements have been duly executed and delivered by Sellers. Subject to the approval of the Bankruptcy Court, this Agreement is a valid and binding agreement of Sellers, enforceable against Sellers in accordance with its terms, and, upon execution and delivery, the Bill of Sale will be a valid and binding agreement of Sellers and shall be enforceable against Sellers in accordance with its terms.

**3.2    Organization and Standing.**  Each Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Sellers have the requisite corporate power and authority to conduct the Business as it is now conducted and to own or lease the Purchased Assets, and to use such Purchased Assets in the conduct of the Business.

**3.3    Condition and Title to Purchased Assets.**

(a)    **Purchased Assets**. Buyer acknowledges and agrees that it is purchasing, and shall take possession of, the Purchased Assets in their "AS IS, WHERE IS" and "WITH ALL FAULTS" condition and that it has previously been given the opportunity to conduct, and has conducted, such investigations and inspections of the Purchased Assets as it has deemed necessary or appropriate for the purposes of this Agreement.

(b)    **No Warranties Regarding Purchased Assets**. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATIONS, STATEMENTS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES REGARDING THE CONDITION, QUANTITY OR QUALITY OF ANY OR ALL OF THE PURCHASED ASSETS OR CONCERNING THE PAST, PRESENT OR FUTURE PROFITABILITY OR VIABILITY OF THE BUSINESS, AND ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED HEREBY BY SELLERS.

(c)  **Title to and Adequacy of Purchased Assets**.  Except as disclosed on Schedule 3.3 hereto, Sellers have, and on the Closing Date will convey and transfer to Buyer, good, complete and marketable title to all of the Purchased Assets, free and clear of all Encumbrances of any nature whatsoever except as set forth in the Sale Order.  Except as set forth on Schedule 3.3, all of the Purchased Assets (excluding customers) are to Sellers' Knowledge in the exclusive possession and control of Sellers, and Sellers have the unencumbered right to use, and to sell to Buyer in accordance with the terms and provisions of this Agreement, all of the Purchased Assets without interference from and free of the rights and claims of others.

(d)  **Subsidiary Group**.

(i)  To Sellers' Knowledge, each member of the Subsidiary Group is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed and has all requisite power and authority to own, lease and operate its properties and assets.

(ii)  To Sellers' Knowledge, there are no outstanding equity or other interests, or rights to acquire any such interest, in any member of the Subsidiary Group other than the equity interests of the Sellers' subsidiaries to be acquired by Buyer hereunder and interests held by another member of the Subsidiary Group.

(iii)  To Sellers' Knowledge, there is no known Action in progress or pending against any member of the Subsidiary Group, and no such member has in the last three years sent or received any notices concerning infringement, violation or misappropriation to or from any third party concerning any Intellectual Property Rights.  To Sellers' Knowledge, each member of the Subsidiary Group is in compliance in all material respects with all applicable laws, all Contracts to which it is a party and the Payment Card Industry Data Security Standards.

(iv)  To Sellers' Knowledge, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not (A) conflict with or result in any violation of any law, rule, regulation, judgment, order, decree or ordinance applicable to any member of the Subsidiary Group or its properties or assets, (B) conflict with or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit, under (i) any provision of its organizational documents or (ii) any material Contract permit, concession, franchise or license or any writ, order or decree to which it is a party or by which it or any of its property is bound, or (C) alter or impair in any material respect any of its rights in or to any material Intellectual Property Rights.

(v)  To Sellers' Knowledge, except for the entry of the Sale Order, no consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required in connection with the direct or indirect transfer of control of any member of the Subsidiary Group to Buyer hereunder, other than such filings, notices or consents, the failure of which to make or obtain would not have a Subsidiary Group MAE.

(vi)  To Sellers' Knowledge, the members of the Subsidiary Group have all necessary rights to use all material Intellectual Property Rights currently used by them, and exclusively own all such Intellectual Property Rights purported to be owned by them (including with respect to all software, content, and other materials developed by their employees or contractors) (other than non-exclusive licenses granted in the ordinary course of business).  To Sellers' Knowledge, the Subsidiary Group has possession of all source code (and related documentation), object code, and content used in

their consumer-facing software applications, has taken reasonable measures to maintain the confidentiality of their material confidential information (including source code), and do not utilize any open source software with such applications in a manner that has been or would reasonably be expected to be material to the commercialization or exploitation thereof. To Sellers' Knowledge, the information technology systems and assets of the Subsidiary Group have not materially malfunctioned, failed, or been compromised within the past three years, and the Subsidiary Group has implemented backup, security, and disaster recovery measures for the those systems and assets consistent with industry practices.

(vii)    To Sellers' Knowledge, each member of the Subsidiary Group has (i) timely filed all United States and foreign material tax returns (federal, state and local) required to be filed by such member and (ii) paid, or caused to be paid, all material taxes, assessments and other governmental charges.

(viii)    To Sellers' Knowledge, each member of the Subsidiary Group that is formed in the United States (i) is, and has been since its formation, a "disregarded entity" within the meaning of U.S. Treasury Regulation § 301.7701-3 for U.S. federal income tax purposes the beneficial owner of which is a "United States person"(within the meaning of Section 7701(a)(30) of the Code) and (ii) is not and has not at any relevant time been treated as an association taxable a corporation for U.S. federal income tax purposes.

(ix)    To Sellers' Knowledge, other than the arrangements to be settled prior to Closing as contemplated by Section 5.4, no member of the Subsidiary Group is party to any Contract or other arrangement with, or has any liability or obligation to, either of the Sellers or their affiliates, or any of their respective equity holders, directors, officers or any of their family members (collectively, "Seller Related Parties").

(x)    Sellers have provided Buyer with certain balance sheets and other financial information regarding the Subsidiary Group which, taken together, present fairly and accurately in all material respects the combined assets and liabilities of the Subsidiary Group. To Sellers' knowledge, no member of the Subsidiary Group has any liabilities, except liabilities disclosed or reserved against in the balance sheet(s) of the Subsidiary Group provided to Buyer, and no member of the Subsidiary Group will incur additional liabilities trigged in whole or in part by the change of control of any member of the Subsidiary Group or the Business.

**3.4    Insurance.**  Sellers have delivered to Buyer true and correct copies of all policies of fire, general liability, worker's compensation, errors and omissions, malpractice and other forms of insurance maintained by or on behalf of Sellers in connection with the Business as protection for the Purchased Assets. To Sellers' Knowledge, all of such policies are now in full force and effect. Sellers have not received any notice of cancellation or material amendment of any such policies. To Sellers' Knowledge, no coverage thereunder is being disputed; and all material claims thereunder have been filed in a timely fashion.

**3.5    No Broker**.  Other than Kroll Securities, LLC ("Kroll"), whom Sellers have retained as their exclusive investment banker, Sellers have not retained or used the services of any agent, finder or broker in connection with the transactions contemplated by this Agreement. Sellers shall be solely responsible for the payment of Kroll's investment banking fee.

**3.6    Representations and Warranties of Sellers.**  The representations and warranties of Sellers contained herein do not to Sellers' Knowledge contain any statement of a material fact that was untrue when made or omits any information necessary to make any such statement contained therein, in light of the circumstances under which such statement was made, not misleading.  To Sellers' Knowledge, the copies of all documents furnished by Sellers to Buyer pursuant to the terms of this Agreement are complete and accurate copies of the original documents.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby makes the representations and warranties set forth in this Section 4 to Sellers:

**4.1    Authority and Binding Effect**.  Buyer has the full corporate power and authority to execute and deliver this Agreement and the Bill of Sale (as hereinafter defined).  This Agreement and the Bill of Sale and the consummation by Buyer of its obligations contained herein and therein have been duly authorized by all necessary corporate actions of Buyer and such agreements have been duly executed and delivered by Buyer.  This Agreement is a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, and, upon execution and delivery, this Agreement and the Bill of Sale will be valid and binding agreements of Buyer and shall be enforceable against it in accordance with their terms.  It is not necessary for Buyer to take any action or to obtain any approval, consent or release by or from any third person, governmental or other, to enable Buyer to enter into or perform its obligations under this Agreement and the Bill of Sale.

**4.2    Organization and Standing.**  Buyer is a limited liability company duly organized and validly existing under and is in good standing under the laws of the State of Florida.  Buyer has all requisite corporate power to own and operate its properties and assets, and to carry on its business as presently conducted.  Buyer is duly qualified to do business and is in good standing in each jurisdiction in which the character of the business conducted by it or the location of the properties owned or leased by it make such qualification necessary.

**4.3    Compliance with Other Instruments.**  The execution and delivery of this Agreement, the Bill of Sale and all other agreements to be entered into in connection herewith and the consummation of the transactions contemplated hereby and thereby will not conflict with or result in any violation of any law, rule, regulation, judgment, order, decree or ordinance applicable to Buyer or its properties or assets, or conflict with or result in any breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit, under (i) any provision of the organizational documents of Buyer; or (ii) any material Contract permit, concession, franchise or license or any writ, order or decree to which Buyer is a party or by which Buyer or any of its property is bound.

**4.4    Governmental Consent, etc.**  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or the consummation by Buyer of the transactions contemplated hereby.

**4.5    No Broker.**  Buyer has not retained or used the services of an agent, finder or broker in connection with the transactions contemplated by this Agreement.  Buyer shall pay, and shall indemnify, hold harmless and defend Sellers from and against, all commissions, finder's and other fees

and expenses charged or asserted by any agent, finder or broker, by reason of any such retention or use of the services of any such agent, finder or broker by Buyer.

      **4.6**    **Investigation.**  Buyer acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Purchased Assets, that it has made all such reviews and inspections of the Purchased Assets as it deems necessary and appropriate, and that in making its decision to enter into this Agreement, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties other than those expressly set forth in this Agreement, as to which it has relied.

      **4.7**    **Funding.**  Buyer has all funding available to it to enable it to consummate its purchase of the Purchased Assets and to pay all of the other obligations of Buyer under this Agreement, including any post-Closing obligations related to Designation Rights.  Buyer's entry into this Agreement and ability to perform under this Agreement is therefore not subject to any financing contingency.

      **4.8**    **Representations and Warranties of Buyer.**  The representations and warranties of Buyer contained herein do not contain any statement of a material fact that was untrue when made or omits any information necessary to make any such statement contained therein, in light of the circumstances under which such statement was made, not misleading.  The copies of all documents furnished by Buyer to Sellers pursuant to the terms of this Agreement are complete and accurate copies of the original documents.

## ARTICLE V

## CONDUCT OF BUSINESS PENDING THE CLOSING

      Between the date hereof and the Closing, and except as otherwise consented to by Buyer in writing, Sellers covenant as follows:

      **5.1**    **Access.**  From and after the date of execution of this Agreement by Sellers or following the completion of the Auction at which Buyer is determined by Sellers to be the winning bidder, whichever occurs first, Sellers shall give to Buyer and its representatives access during normal business hours to the premises, employees, agents and consultants of Sellers and the members the Subsidiary Group, and such copies of Sellers' and each Subsidiary Group member's books and records, Contracts and other documentation, so as to enable Buyer to inspect and evaluate all aspects of the Business and operations, assets, operating results, financial condition, capitalization, ownership, and legal affairs relating to the Business pending the Closing.  Buyer agrees to conduct its review, and to cause its representatives to conduct their review, in a manner designed to minimize any disruption of Sellers' business.  Buyer will hold any confidential information obtained pursuant to this Section 5.1 in accordance with the confidentiality provisions of any non-disclosure agreement ("NDA") entered into between the Buyer and Sellers.

      **5.2**    **Conduct of the Business.**  From and after the date of execution of this Agreement by the Parties or following the completion of the Auction at which Buyer is determined by Sellers to be the winning bidder, whichever occurs first, Sellers shall, and shall cause the Subsidiary Group to, operate and conduct the Business diligently and only in the ordinary course, consistent with past practices and not make any material change in their methods of accounting, management, marketing or operations, except as otherwise required by the Bankruptcy Court or as otherwise set forth in any cash collateral or debtor-in-possession financing orders approved by the Bankruptcy Court.  In

furtherance thereof, unless Buyer's prior consent to do otherwise is obtained (which consent shall be in Buyer's sole discretion), Sellers shall:

(a) **Organization.** Use commercially reasonable efforts to preserve intact their organizations (including the Subsidiary Group), operate the Business in compliance with all applicable laws and to retain the employees involved in the Business and the services of the Business' vendors, suppliers, agents and consultants;

(b) **Insurance.** Maintain insurance consistent with past practices and not take any action to terminate or modify, or permit the lapse or termination of, the present insurance policies and coverages of Sellers or any member of the Subsidiary Group;

(c) **Agreements.**

(i)     Observe and perform all of their post-bankruptcy obligations under the Assigned Contracts;

(ii)    Not (x) amend, grant any waiver under, cancel or terminate any Assigned Contract or (y) cause or permit any member of the Subsidiary Group to enter into, amend, grant any waiver under, cancel or terminate any Contract that is material to such member of the Subsidiary Group;

(iii)   Promptly notify Buyer of the occurrence of any post-bankruptcy breach or default of any Assigned Contract known to Sellers; and

(iv)    Not encourage or incentivize any employee involved in the Business to leave their current position or alter their responsibilities with Sellers or increase the compensation, incentive arrangements or other benefits of any employee of the Business;

(d) **Consents; Compliance with Laws to the Extent Related to the Business.**

(i)     Use commercially reasonable efforts to obtain all consents or approvals of governmental authorities and customers and suppliers of the Business, and maintain all other licenses, permits and franchises and rights to operate the Business granted by, governmental authorities;

(ii)    Not take any action which would be expected to result in (a) a violation of or in the noncompliance with any laws or regulations applicable to the Business or (b) a Subsidiary Group MAE; and

(iii)   Cooperate with Buyer and render to Buyer such assistance as Buyer may reasonably request in obtaining any such consents and approvals;

(e) **Taxes.** Pay, when due, and prior to the imposition or assessment of any interest, penalties or liens by reason of the nonpayment of, all post-bankruptcy Taxes, due or assessed against them, except for any Taxes being contested in good faith;

(f) **Representations and Warranties.** Not take any action that would make any representation and warranty of Sellers inaccurate as of the Closing Date or that would reasonably be expected to result in any of the conditions to Closing set forth in Article VIII not being satisfied;

12

(g)  **Subsidiary Group.**  Not take (or agree to take) any action to cause any member of the Subsidiary Group to take (or agree to take) any action to: (i) amend its organizational documents, (ii) issue or redeem any equity or other security or interest, incur any indebtedness or other obligations for the payment of money, other than trade payables incurred in the ordinary course of business consistent with past practice, (iii) make or change any tax election or accounting methodologies, (iv) adopt, amend or terminate any employee severance or other benefit plan, (v) commence any Action, (vi) distribute, sell or otherwise dispose of any assets other than sales of inventory in the ordinary course of business consistent with past practice, (vii) hire or terminate any employees, or (viii) enter into any Contract with a Seller Related Party.

**5.3**    **Notification of Certain Matters.**  Sellers shall give prompt notice to Buyer of (i) the occurrence or non-occurrence, to Sellers' Knowledge, of any event the occurrence or non-occurrence of which would cause any representation or warranty of Sellers contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date and (ii) any failure to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by Sellers hereunder; provided, however, that the delivery of any notice pursuant to this Section 5.3 shall not limit or otherwise affect the remedies available hereunder to Buyer.

**5.4**    **Settlement of Intercompany Accounts**.  Prior to the Closing Sellers shall take all necessary actions to (i) settle and eliminate all intercompany accounts and arrangements between the Sellers, on the one hand, and any member of the Subsidiary Group, on the other hand, and (ii) terminate all Contracts between any member of the Subsidiary Group, on the one hand, and any Seller Related Party, on the other hand, in each case, without further liability or obligation on the part of any member of the Subsidiary Group.

**ARTICLE VI**

**OBLIGATIONS SURVIVING THE CLOSING**

**6.1**    **Further Assurances.**  Each Party shall execute and deliver after the date hereof such instruments and take such other actions as the other Party may reasonably request in order to carry out the intent of this Agreement or to better evidence or effectuate the transactions contemplated herein. After the Closing, the Sellers shall promptly transfer or deliver to Buyer checks (which shall be properly endorsed) or other property that the Sellers may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Purchased Assets or relates to the Assumed Obligations.  After the Closing, Buyer shall promptly transfer or deliver to Sellers any property that is or comes into Buyer's possession that constitutes part of the Excluded Assets.  Following the Closing, at the reasonable request of Sellers and at Sellers' sole expense, Buyer will provide reasonable access to (and make copies of) the books and records of the Sellers acquired by Buyer as Purchased Assets hereunder (provided Buyer has received possession of such books and records) to the extent relevant to the Excluded Assets (including the Estate Claims) and Sellers' (or their assignees') liquidation or other disposal of such assets.  Sellers' (or their assignees') liquidation or disposal of the Excluded Assets shall not be deemed to be a breach of this Agreement or of any Intellectual Property Rights of Buyer (on condition that, with respect to use of any trademarks, use thereof is limited to the extent necessary to so liquidate or dispose of such assets and is consistent with the use by the Business prior to the date hereof).  When liquidating or otherwise disposing of such assets, Sellers (and their assignees) shall make clear to all relevant parties that Sellers (or their assignees), rather than Buyer and its Affiliates, are liquidating or disposing such assets. Notwithstanding the forgoing, nothing in this Section 6.1 or this Agreement shall (i)  require the Buyer to incur any cost or expense in providing

access hereunder or (ii) require Buyer to provide access to any materials prepared by the Buyer's financial, legal or other advisors which is subject to an attorney/client privilege or an attorney work product privilege or which may not be disclosed pursuant to applicable law, a protective order or confidentiality agreement.

6.2     **Expenses.**  Each Party shall pay all of its respective costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in carrying out and closing the transactions contemplated by this Agreement whether or not this Agreement or the transactions contemplated hereby are ever consummated.

6.3     **Taxes.**  Buyer shall pay all Taxes of any kind or nature arising from the sale and transfer of the Purchased Assets to Buyer.  Sellers shall pay all Taxes of any kind or nature arising from the conduct or operation of the Business up to the Closing Date.  If any Taxes required under this Section 6.3 to be borne by Sellers are assessed against Buyer or any of the Purchased Assets, Buyer shall notify Sellers in writing promptly thereafter and Sellers shall be entitled to contest, in good faith, such assessment or charge so long as such assessment does not materially adversely affect Buyer or the Purchased Assets or the Buyer's business.  Notwithstanding the foregoing, Buyer may (but shall not be obligated to) pay any such Taxes assessed against it, its business or any of the Purchased Assets, but which are payable by Sellers pursuant hereto, if the Buyer's failure to do so, in the reasonable judgment of the Buyer, could result in the immediate imposition of an Encumbrance on any of the Purchased Assets or any other assets of the Buyer or if Sellers fail to contest such assessment or charge diligently and in good faith.

## ARTICLE VII

## SURVIVAL OF REPRESENTATIONS AND WARRANTIES

Except as specifically set forth in Article VI above, all of the respective representations and warranties of Sellers and Buyer set forth in this Agreement or in any of such Party's disclosure schedules, or in any certificates delivered by such Party on the Closing Date, shall terminate effective as of the Closing.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

The obligation of Buyer to consummate its purchase of the Purchased Assets from Sellers is subject to the fulfillment, or the waiver by Buyer, at or prior to the Closing, of each of the following conditions precedent:

8.1     **Representations and Warranties.**  The representations and warranties made by Sellers in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Closing Date, with the same force and effect as if made again at and as of that time.

8.2     **Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order that has been issued by any court or governmental agency having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets hereunder.

**8.3    Performance of Obligations.**  Sellers shall have performed and complied, in all material respects, with all of the covenants required by this Agreement to have been performed prior to the Closing.

**8.4    Delivery of Additional Instruments.**  On the Closing Date, Sellers shall deliver, or cause to be delivered to Buyer, the following documents and instruments, in form and substance satisfactory to Buyer and its counsel, unless waived in writing by Buyer:

(a)    The Bill of Sale and Assumption Agreement in substantially the form of Exhibit C hereto, duly executed by Sellers (the "Bill of Sale");

(b)    Evidence of the receipt of all third-party consents necessary, if any, to enable Sellers to consummate the transactions contemplated herein, which consents are identified on Schedule 8.5, except (i) to the extent the Bankruptcy Court enters an order approving of Sellers' assumption and assignment to Buyer of the Assigned Contracts, (ii) to the extent any contract, agreement or lease cannot be assigned to Buyer, and (iii) as set forth in the Sale Order;

(c)    A list (in a form and format as reasonably requested by Buyer) setting forth all login, username, and password information for computers, printers, equipment, software, systems, web sites, and accounts owned, controlled, or otherwise used (i) by the Sellers and related to the Purchased Assets or Assumed Obligations or (ii) by any member of the Subsidiary Group; and

(d)    Such other documents and instruments as Buyer or Buyer's counsel may reasonably request so as better to evidence or effectuate the transactions contemplated hereby.

**8.5    Sale Order.**  The Bankruptcy Court shall have entered the Sale Order in form reasonably acceptable to Buyer. The Sale Order shall be entered by the Bankruptcy Court. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Sellers of this Agreement, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Claims, Liabilities and Encumbrances (other than Liabilities and Encumbrances included in the Assumed Obligations and Permitted Encumbrances), and (C) the performance by Buyer and Sellers of their obligations under this Agreement; and (ii) find that Buyer is a "good faith" Buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Sellers and grant Buyer the protections of Section 363(m) of the Bankruptcy Code. Buyer agrees that it will promptly take such actions requested by the Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code, and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. At the time of the Closing, the Sale Order shall not have been reversed, stayed, modified or amended in any manner materially adverse to Buyer. The Sale Order becoming a final order is not a condition to Buyer's obligation to effectuate the Closing, and the existence of any pending appeal of the Sale Order shall not constitute a basis for Buyer's failure to consummate the transactions contemplated hereby.

**8.6    Accounts Receivable**.  Sellers shall have delivered evidence reasonably satisfactory to Buyer demonstrating that as of the Closing Date, the Purchased AR includes bona fide receivables of at least $3,500,000 that are aged less than 60 days.  In the event that such Purchased AR as of the Closing Date is less than $3,500,000, the amount of the Purchase Price to be paid by the Buyer at the

Closing shall be reduced by the extent to which the Purchased AR as of the Closing Date is less than $3,500,000.

**8.7    Inventory**.  Sellers shall have delivered evidence reasonably satisfactory to Buyer demonstrating that on the Closing Date, Sellers will deliver to Buyer Purchased Inventory having an aggregate total cost in Sellers' accounts of at least $15,000,000, and including "strap" inventory having an aggregate product cost in Seller's accounts of at least $3,400,000.  In the event that Buyer elects to have any such inventory be part of the Excluded Assets rather than the Purchased Assets, these two figures of $15,000,000 and $3,400,000 shall be reduced by the applicable amount of such inventory that becomes part of the Excluded Assets.

**8.8    Subsidiary Group.**  Sellers shall have delivered evidence reasonably satisfactory to Buyer demonstrating that as of the Closing Date (i) the aggregate accrued and unpaid third-party liabilities of the Subsidiary Group (excluding accrued  payroll or other ordinary course employee accruals for the current pay period ending after Closing and the liabilities contemplated by clause (ii) below) are less than $100,000, (ii) the aggregate accrued and unpaid third-party liabilities of Fitness Anywhere UK Limited (excluding accrued payroll or other ordinary course employee accruals for the current pay period ending after Closing) are less than £400,000 (British Pounds), and (iii) there shall not have occurred and be continuing any Subsidiary Group MAE.

## ARTICLE IX

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligation of Sellers to consummate the sale of the Purchased Assets to Buyer is subject to the fulfillment, or the waiver by Sellers, at or prior to the Closing, of each of the following conditions precedent:

**9.1    Representations and Warranties.**  The representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects, unless modified by materiality in the representation or warranty, in which case they shall be true and correct in all respects, on the date hereof and at and as of the Closing Date, with the same force and effect as if made again at and as of that time.

**9.2    Absence of Stay or Injunction Preventing Sale Closing.**  There shall be no order that has been issued by any court or governmental agency having jurisdiction that restrains or prohibits the consummation of the purchase and sale of the Purchased Assets hereunder.

**9.3    Performance of Obligations.**  Buyer shall have performed and complied in all material respects with all of its covenants required by this Agreement to have been performed by it at or prior to the Closing.

**9.4    Delivery of Additional Instruments.**  On the Closing Date, Buyer shall deliver, or cause to be delivered to Sellers, the following documents and instruments, in form and substance satisfactory to Sellers and their counsel, unless waived in writing by Sellers:

(a)    The Bill of Sale duly executed by Buyer; and

(b)   Such other documents and instruments as Sellers or Sellers' counsel may reasonably request so as better to evidence or effectuate the transactions contemplated hereby.

**9.5    Delivery of Consideration.**  At the Closing, Buyer shall deliver to Sellers a cash payment in the remaining amount of the Purchase Price.

## ARTICLE X

## THE CLOSING

The consummation of the transactions contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Levene, Neale, Bender, Yoo & Golubchik L.L.P. or at such other place as the parties may agree and shall occur on the later of (i) August 26, 2022 and (ii) two (2) business days  after  the closing conditions set forth in Section 8 and Section 9 above have been satisfied or waived (the "<u>Outside Closing Date</u>"), or by such later date and time upon which the Buyer and Sellers mutually agree (the date the Closing occurs, the "<u>Closing Date</u>").

**10.1    Closing Deliveries of Sellers.**  At the Closing, Sellers shall deliver, or cause to be delivered to Buyer, the documents and instruments set forth in Section 8 above, in form and substance reasonably satisfactory to Buyer and its counsel.

**10.2    Closing Deliveries of Buyer.**  At the Closing, Buyer shall deliver, or cause to be delivered, the remaining Purchase Price to Sellers and the documents and instruments set forth in Section 9 above, in form and substance reasonably satisfactory to Sellers and their counsel.

## ARTICLE XI

## TERMINATION

**11.1    Termination.**  Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date:

(a)   by mutual written agreement of Buyer and Sellers;

(b)   by Buyer if there has been a material breach by Sellers of their representations, warranties or covenants set forth herein which is not or cannot be cured by Sellers prior to the Closing or if any material condition to the obligation of Buyer under this Agreement to be complied with or performed by Sellers at or before the Closing shall not have been complied with or performed at the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by Buyer or cured by Sellers prior to the Closing;

(c)   by either Buyer or Sellers if any judgment, injunction, order or decree of a court or other governmental entity of competent jurisdiction enjoining Buyer or Sellers from consummating the transactions contemplated by this Agreement shall have been entered;

(d)   by Sellers if there has been a material breach by Buyer of its representations, warranties or covenants set forth herein which is not or cannot be cured by Buyer prior to the Closing or if any material condition to the obligation of Sellers under this Agreement to be complied with or performed by Buyer at or before the Closing shall not have been complied with or performed at

the time required for such compliance or performance and such noncompliance or nonperformance shall not have been waived by Sellers or cured by Buyer prior to the Closing; or

(e) by either Buyer or Sellers if prior to the Closing Date, (i) the Sellers seek to have the Bankruptcy Court enter an order dismissing, or converting the Bankruptcy Case into a case(s) under chapter 7 of the Bankruptcy Code, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code, or (ii) an order of dismissal, conversion or trustee appointment is entered for any reason.

**11.2     Procedure Upon Termination.**  In the event of termination of this Agreement by Buyer or Sellers or by both Buyer and Sellers pursuant to Section 11.1 hereof, the transactions contemplated herein shall be abandoned without further action by Buyer or Sellers.  In addition, if this Agreement is terminated as provided herein:

(a)  Each Party will redeliver all documents, workpapers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

(b)  All information of a confidential nature received by any party hereto with respect to the business of any other party (other than information which is a matter of public knowledge or which has heretofore been or is hereafter published in any publication for public distribution or filed as public information with any governmental authority) shall continue to be subject to any NDA between Buyer and Sellers.

(c)  Upon any termination of this Agreement pursuant to this Section 11, the respective obligations of the Parties under this Agreement shall terminate and no Party shall have any liability whatsoever to any other Party by reason of such termination, irrespective of the cause of such termination, except as set forth in this Section.

**11.3     Forfeiture of Deposit as Liquidated Damages**.

Subject to the entry of the Sale Order by the Bankruptcy Court and satisfaction or waiver by Buyer of the conditions set forth in Article VIII, if Buyer fails to consummate the Closing by the Outside Closing Date (unless Buyer and Sellers jointly agree to extend the Outside Closing Date), Buyer shall be deemed to have permanently forfeited the Deposit with Sellers, and forfeiture of the Deposit shall be the Sellers' sole and exclusive remedy as liquidated damages for any and all losses or damages of any nature against Buyer in respect of this Agreement or the transactions contemplated hereby.

## ARTICLE XII

## MISCELLANEOUS

**12.1     Assignment.**  Neither Sellers nor Buyer may assign this Agreement, or assign any of their rights or delegate any of their duties hereunder, without the prior written consent of the other Party, except that Buyer may assign any of its rights and delegate any of its duties hereunder to a controlled affiliate of Buyer without Sellers' consent provided that no such assignment or delegation

shall relieve Buyer of its obligations hereunder.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by the Parties and their respective successors and assigns.

**12.2    Severability.**    Any provision of this Agreement which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.

**12.3    Governing Law.**  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code, to the extent applicable, and, where state law is implicated, the internal laws of the state of California, without giving effect to any principles of conflicts of law.  Without limiting any Party's right to appeal any Order of the Bankruptcy Court, the Parties agree that if any dispute arises out of or in connection with this Agreement or any of the documents executed hereunder or in connection herewith, the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Agreement. The Bankruptcy Court shall have sole jurisdiction over such matters and the parties affected thereby, and Buyer and Sellers each hereby consent and submit to such jurisdiction; provided, however, that if the Bankruptcy Cases have closed and cannot be reopened, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the district in which the Bankruptcy Court is located and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in <u>Section 12.8</u> hereof, unless another address has been designated by such Party in a notice given to the other Party in accordance with the provisions of <u>Section 12.8</u> hereof.

**12.4    Entire Agreement; Amendment.**  This Agreement and the Exhibits and Schedules hereto, and each additional agreement and document to be executed and delivered pursuant hereto, constitute all of the agreements of the Parties with respect to, and supersede all prior agreements and understandings relating to the subject matter of, this Agreement or the transactions contemplated by this Agreement.  This Agreement may not be modified or amended except by a written instrument specifically referring to this Agreement signed by the Parties.

**12.5    Waiver.**  No waiver by one Party of the other Party's obligations, or of any breach or default hereunder by any other Party, shall be valid or effective, unless such waiver is set forth in writing and is signed by the Party giving such waiver; and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature or any other breach or default by such other Party.

**12.6    Interpretation; Headings.**  This Agreement is the result of arms'-length negotiations between the Parties and no provision hereof, because of any ambiguity found to be contained therein or otherwise, shall be construed against a Party by reason of the fact that such Party or its legal counsel was the draftsman of that provision.  The section, subsection and any paragraph headings contained herein are for the purpose of convenience only and are not intended to define or limit or affect, and

shall not be considered in connection with, the interpretation of any of the terms or provisions of this Agreement.

     **12.7    Counterparts.**  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement shall become effective when counterparts have been signed by each of the Parties and delivered by facsimile or other means to the other Party.  Signatures transmitted by facsimile or electronically shall be deemed to have the same force and effect as original signatures.

     **12.8    Notices.**  Any notice shall be in writing and shall be deemed to have been duly given or made when personally delivered, sent by Email or when mailed by registered or certified mail, postage prepaid, return receipt requested, addressed or directed as follows, or as may be furnished hereafter by notice, in writing, to the other Party on at least three (3) business days' prior notice, to the following parties. Any Party may from time to time, by written notice to the other Party, designate a different address, which shall be substituted for the one specified below.  In addition to any other means of deliverance provided, all notices provided hereunder must also be delivered by email.

If to Sellers:

     _____
     _____
     _____
     Attn:  _____
     Email:
     Fax:  (\_\_\_) \_\_\_-\_\_\_\_

with a copy to (which shall not constitute notice) given in a like manner to:

     Ron Bender, Esq.
     Levene, Neale, Bender, Yoo & Golubchik L.L.P.
     2818 La Cienega Ave.
     Los Angeles, California 90034
     Email: RB@LNBYG.COM
     Fax:  (310) 229-1244

If to Buyer, to:

     Mr. Jack Daly
     Email: JackXDaly@gmail.com

with a copy to (which shall not constitute notice) given in a like manner to:

     Fried, Frank, Harris, Shriver & Jacobson, LLP
     One New York Plaza
     New York, NY 10004
     Attn:  Christopher Ewan, Esq. and Gary Kaplan, Esq.
     Email: Christopher.Ewan@friedfrank.com; Gary.Kaplan@friedfrank.com
     Fax:  (212) 859-4000

**12.9    Public Announcements.**    Neither Sellers nor Buyer will make any public announcements concerning matters set forth in this Agreement or the negotiation thereof without the prior written consent of the other Party unless such disclosure is required by law or court order or the information is otherwise publicly available, including in any filings with the Bankruptcy Court.  Any such disclosure shall be provided for review to the other Party in advance of public release to the extent reasonably practical.

**12.10    Change of Name.**    As soon after the Closing as reasonably possible, the Sellers shall discontinue the use of their current names (and any other trade names or "d/b/a" names currently utilized by the Sellers or their direct or indirect Subsidiaries) and shall not subsequently change their names to or otherwise use or employ any name which includes the words "TRX," "Fitness Anywhere," or any derivation thereof, and the Sellers shall cause the names of the Sellers in the caption of the Bankruptcy Cases to be changed to the new name of the Sellers, unless the Bankruptcy Cases are dismissed prior to September 15, 2022.

**[SIGNATURES ARE CONTAINED ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, each of Sellers and Buyer has caused a duly authorized representative to execute this Asset Purchase Agreement on the date first written above.

**BUYER:**

**JFXD CAPITAL, LLC,**
a Florida limited liability company

By: _____

Name:  Jack Daly
Title:   Managing Member

**SELLERS**:

**TRX HOLDCO, LLC,**
a Delaware corporation

By: _____

Name: _____
Title: _____

**FITNESS ANYWHERE LLC, dba**
**TRX AND TRX TRAINING**
a Delaware corporation

By: _____

Name: _____
Title: _____

## **SCHEDULES**

Schedule 1.1(a)          Fixed Assets

Schedule 1.1(b)          Assigned Contracts

Schedule 1.1(d)          Accounts

Schedule 1.1(f)          Licenses and Permits

Schedule 1.1(g)          Leased Real Property

Schedule 1.1(h)          Inventory

Schedule 1.1(i)          Intellectual Property Rights

Schedule 1.1(j)          Excluded Insurance Benefits

Schedule 1.1(k)          Claims Against Third Parties

Schedule 1.1(l)          Customer Lists

Schedule 1.2            Excluded Assets

Schedule 1.3            Designation Rights Assets

Schedule 3.3            Exceptions to Purchased Assets Sold Free/Clear of Encumbrances

Schedule 8.5            Third Party Consents

## **EXHIBITS**

Exhibit A          Definitions

Exhibit B          Purchase Price Allocation

Exhibit C          Form of Bill of Sale and Assumption Agreement

<u>Schedule 1.1(a)</u>

Fixed Assets

*All of Sellers' supplies, computers, printers, equipment, furniture, fixtures and other similar assets or tangible personal property owned by Sellers which are identified in the fixed asset schedule attached hereto as* <u>*Schedule 1.1(a)*</u>

**See attached list.**

## Schedule 1.1(b)

Assigned Contracts

*All of Sellers' rights, title, interest and benefits under the agreements, contracts, licenses, instruments, commitments and understandings that are listed in Schedule 1.1(b) attached hereto.*

**Assigned Contracts**

TBD

**Equipment Leases**

Fitness Anywhere LLC is a party to one equipment lease agreements with Elite Forklift Service and Repairs, Inc., for one forklift used at the Company's distribution center in Ontario, California. There is no written equipment lease agreement for this forklift.

<u>Schedule 1.1(d)</u>

Accounts

*All of Sellers' accounts related to the Business, all of which are identified on <u>Schedule 1.1(d)</u> attached hereto as of the date of the Schedule and all schedules, records and other documentation related to such accounts or notes receivable*

**See attached list.**

<u>Schedule 1.1(f)</u>

Licenses and Permits

*To the extent transferable, all of Sellers' licenses, permits or other authorizations of governmental or regulatory entities that are required under any laws, rules and regulations applicable to or affecting the Business, which are set forth on <u>Schedule 1.1(f)</u>*

1.  City of Ontario Business License Number 1247908 (Effective Date February 1, 2022; Expiration Date January 31, 2023).

**STATE OF ORGANIZATION AND STATE ORGANIZATIONAL IDENTIFICATION NUMBER**

| Legal Name | State of Organization for Filing UCC Financing Statement | State Organizational Identification Number |
|---|---|---|
| **TRX Holdco, LLC** | **Delaware** | **7891715** |
| **Fitness Anywhere LLC** | **Delaware** | **4930425** |

**Qualifying Jurisdictions**

**Fitness Anywhere LLC**

| State | Jurisdiction ID |
|---|---|
| Arizona | R18364889 |
| California | 201106710177 |
| Colorado | 20131213699 |
| Connecticut | 1243383 |
| Delaware | 4930425 |
| Florida | M13000002157 |
| Georgia | 13397498 |
| Illinois | 04288513 |
| Indiana | 2013040300087 |
| Kansas | 4783650 |
| Kentucky | 0854130 |
| Louisiana | 41446429 Q |
| Maryland | Z15631419 |
| Massachusetts | 001103700 |
| Michigan | 801878207 |
| New Jersey | 0400562062 |
| New York | 4385091 |
| North Carolina | 1310242 |
| Ohio | 2187483 |

| Pennsylvania | 4210775 |
|---|---|
| Rhode Island | 000797892 |
| Tennessee | 000715017 |
| Texas | 801759781 |
| Virginia | T053058-6 |
| Washington | 603156750 |
| West Virginia | 2285-8053 |
| Wisconsin | F050536 |

**TRX Holdco, LLC**

| State | Jurisdiction ID |
|---|---|
| California | 202015810047 |
| Delaware | 7891715 |

Schedule 1.1(g)

Leased Real Property

*To the extent assignable, all of Sellers' leased real property, including any leasehold improvements thereon, all of which are identified in the real property schedule attached hereto as Schedule 1.1(g)*

1.    Lease dated June 19, 2019, as amended by Amendment #1 dated March 4, 2022, by and between Fitness Anywhere LLC and Cedar Avenue Five, LLC. Lease term is valid through May 31, 2023. Address: 1477 E. Cedar, Unit A, Ontario, CA 91761

2.    Lease dated June 18, 2018, as amended by Amendment #1 dated September 26, 2019, Amendment #2 dated March 18, 2020 and Amendment #3 dated March 4, 2022, by and between Fitness Anywhere LLC and Cedar Avenue Five, LLC. Lease term is valid through May 31, 2023. Address: 1477 E. Cedar, Unit B, Ontario, CA 91761.

<u>Schedule 1.1(h)</u>

Inventory

*All of Sellers' inventory, a detailed list of which is set forth on <u>Schedule 1.1(h) as of the date of the Schedule</u>*

**See attached list.**

Schedule 1.1(i)

Intellectual Property Rights

*All of Sellers' Intellectual Property Rights and all goodwill associated with such Intellectual Property Rights, including, without limitation, (i) the right to use, copy, modify, exploit, license, assign, convey and pledge the Intellectual Property Rights, (ii) the right to exclude others from using the Intellectual Property Rights, (iii) the right to sue others and collect damages for past, present and future infringement of the Intellectual Property Rights,(iv) the right to create derivatives of the Intellectual Property and retain full ownership thereof, and (v) the right to file and prosecute applications for registration, now pending or hereinafter initiated, to protect any rights in the Intellectual Property Rights, a detailed list of which is set forth on Schedule 1.1(i)*

**See attached list.**

Licenses

1.    Assigned Contracts that provide a counterparty with the right to manufacture the Sellers' products or the right to distribute or resell the Sellers' products through commercial or retail channels will generally grant a commercially standard right and license to such counterparty to use the Sellers' intellectual property in such manufacturing, distribution or resale activities, while reserving all ownership rights in such intellectual property for the Sellers.

2.    Amended and Restated IP License Agreement dated August 11, 2020 by and between Fitness Anywhere LLC, TRX Holdco, LLC and TRXperience, LLC

3.    Amended and Restated Indi Platform Agreement dated March 1, 2021 by and between Fitness Anywhere LLC and Indi.com, Inc.

4.    Second Amended and Restated Software License & Sales Agreement, by and between Fitness Anywhere LLC and Physmodo, Inc. dated October 19, 2021, as further amended on February 17, 2022.

5.    XD FIT Exclusive License Agreement, by and between Fitness Anywhere LLC and XD FIT, LLC dated June 26, 2020.

6.    Product Services Agreement, by and between Fitness Anywhere LLC and Exemplar Design, LLC dated June 26, 2020.

7.    IP License Agreement for Supply of Goods, by and between Fitness Anywhere LLC and Nantong Jiangsu Sporting and Leisure Utensil Co., Ltd. dated October 20, 2019.

In addition to the agreements specifically referenced above, Sellers' may in the ordinary course of business license or sublicense trademarks (i) to individual trainers or brand influencers; or (ii) in connection with sponsorship or participation agreements relating to industry events. These arrangements are generally governed by standard agreements or, in the case of sponsorships or participation in events, commercially standard agreements, any of which allow these parties to use the trademarks on a non-exclusive, non-sublicensable basis for purposes of promoting the Sellers' brand, products and services.

Schedule 1.1(j)

Excluded Insurance Benefits

*All insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Obligations (as defined herein) prior to the Closing Date except for those set forth on Schedule 1.1(j) which shall be part of the Excluded Assets*

| PROPERTY & CASUALTY | | | |
|---|---|---|---|
| **Coverage** | **Carrier** | **Policy No.** | **Policy Term** |
| **Package  (Property, Auto)** | Hartford Fire Insurance Co. | 10UUNHH8155 | 11/30/21-11/30/22 |
| **General Liability** | Admiral Insurance Co. | CA000036762-02 | 11/30/21-11/30/22 |
| **Excess Liability - Lead $10M** | National Union Fire (AIG) | BE028423876 | 11/30/21-11/30/22 |
| **Excess Liability - $15M x $10M** | Fireman's Fund Insurance Co. | USL002540202 | 11/30/21-11/30/22 |
| **Product Recall** | Berkley Assurance Co. | BGPR005806 | 11/30/21-11/30/22 |
| **Cargo** | Allianz Global | OC91561900 | 11/30/21-11/30/22 |
| **Foreign Package**<br>**(Japan, Canada, UK Local - Property, Liability)** | Hartford Fire Insurance Co. | 10CPGHH8906 | 11/30/21-11/30/22 |
| **Canadian Local - Property** | | 10CPGHH8906<br>(Master Policy no.)<br>05MLT0133427 | 11/30/21-11/30/22 |
| **Japan Local - Employers Responsibility** | Hyundai Marine & Fire Insurance Co.<br>(Local Broker: Cornes & Co., Ltd.) | F202012-00480 | 11/30/21-11/30/22 |
| **Japan Local - GL** | Hyundai Marine & Fire Insurance Co.<br>(Local Broker: Cornes & Co., Ltd.) | F202012-00481 | 11/30/21-11/30/22 |
| **Japan Local - Prop** | Hyundai Marine & Fire Insurance Co.<br>(Local Broker: Cornes & Co., Ltd.) | F202101-00444 | 11/30/21-11/30/22 |
| **UK Local Package - GL/Employers' Responsibility** | Aviva Insurance Ltd.<br>(Local Broker:  Bridge Insurance) | 25255948CCI | 11/30/21-11/30/22 |
| MANAGEMENT & PROFESSIONAL LIABILITY | | | |
| **Management Liability (D&O, EPLI) GO FWD** | AXIS Insurance Company | EKS3315913 | 1/10/2022-1/10/2023 |
| **Employed Lawyer's Liability** | | | |
| **Runoff D&O, EPLI** | Crum & Forster | 5741004015 | 12/26/18 - 12/26/24 |
| **Commercial Crime** | Hiscox Insurance Co. | UC24029093.19 | 12/26/21-12/26/22 |
| **Kidnap, Ransom & Extortion** | Great American Insurance Co. | SCI273610931 | 11/30/21-11/30/22 |
| **Professional Liability (E&O)** | Landmark American Insurance Co. | LHR786094 | 11/30/21-11/30/22 |
| **Cyber Liability** | Hiscox (Lloyd's) | MPL4304991.20 | 11/30/21-11/30/22 |

Schedule 1.1(k)

Claims and Lawsuit Rights Against Third Parties

*All of Sellers' claims and lawsuit rights (pending or not) against third parties relating to the Purchased Assets, whether choate or inchoate, known or unknown, contingent or non-contingent except for those set forth on **this Schedule 1.1(k) which shall be part of the Excluded Assets***

   (a)   Nossk, Inc. (Plaintiff). v. Fitness Anywhere LLC (Defendant); Fitness Anywhere LLC (Counter-Plaintiff) v. Nossk, Inc. (Counter-Defendant); Fitness Anywhere LLC (Third-Party Plaintiff) v. Wonoda, Inc., Mr. Wolfgang Ott and Ms. Nadia Ott (Third-Party Defendants).

   (b)   The following IP contingency case and rights to collection thereunder to the extent any amounts have not yet been collected as of the Closing Date: US District Court, Northern District of Illinois, Case No: 21cv6476; TRX Design Patent; Complaint 12/3/2021; Defendant Default 2/22/2022.

   (c)   All avoidance claims and causes of action including, without limitation, claims and causes of action under Chapter 5 of the Bankruptcy Code and similar state law.

   (d)   All claims and causes of action made against any former or current insiders, affiliates, officers or directors.

<u>Schedule 1.1(l)</u>

Customer Lists

*Customer lists and contact information, which customers are listed on <u>Schedule 1.1(l)</u>*

**See attached list.**

Schedule 1.1(m)

Ownership Interest in Subsidiaries

**Subsidiaries of Fitness Anywhere LLC:**

| Subsidiary Name | Owner | Class of Shares | Number of Shares/Membership Interests | Percent Interest |
|---|---|---|---|---|
| Fitness Anywhere International, LLC | Fitness Anywhere LLC | Membership Interests | 100 Units of Membership Interests | 100% |
| Fitness Anywhere Europe Cooperatief U.A. | Fitness Anywhere LLC | Membership Interests | 99 Units of Membership Interests | 99% |

**Subsidiaries of TRX Holdco, LLC:**

| Subsidiary Name | Class of Units | Number of Membership Interests | Percent Interest |
|---|---|---|---|
| TRXperience, LLC | N/A | N/A | Sole Member |

B-12

## Schedule 1.2

Excluded Assets

*Purchaser shall not acquire, and Sellers shall retain, all of the following assets, properties and rights owned by Sellers (collectively, the "Excluded Assets").*

(a)    All contracts and leases of Sellers that are not Assigned Contracts;

(b)    All notes receivable and any other debt instruments providing for money owing to Sellers;

(c)    All cash and cash equivalents of Sellers and all other items set forth on Schedule 1.2(c) which shall also be part of the Excluded Assets;

(d)    The corporate seals, minute books, stock books, tax returns and other similar records relating to Sellers' corporate organizations, and all employee related or employee benefit related files or records other than personnel files of employees hired by Buyer;

(e)    Except as to the Purchased Assets, all insurance recovery rights of Sellers and all tax refunds owing to Sellers, including, but not limited to, those set forth on Schedule 1.2(e) which shall also be part of the Excluded Assets;

(f)    All rights to all claims, causes of action, choses in action, rights of recovery and rights of set-off (whether choate or inchoate, known or unknown, contingent or non-contingent) in favor of Sellers that are not included with Section 1.1(k) above, all avoidance causes of action existing under any of sections 544-553, inclusive, of the Bankruptcy Code; and all claims and causes of action, either direct or derivative, that would expressly inure to the benefit of the creditors in these Bankruptcy Cases, including those claims against any former or current insiders, affiliates, officers or directors, and to the extent applicable insurance recoveries related to such claims;  and

(g)    All other assets identified in Schedule 1.2.

### Schedule 1.2(b)

(a)    Amended and Restated Secured Note from Physmodo, Inc. dated February 28, 2019 in the principal amount of $100,000 (Fitness Anywhere LLC)

(b)    Full Recourse Promissory Note from Randal A. Hetrick dated January 2, 2019 in the principal amount of $750,000.

### Schedule 1.2(c)

(a)    All cash and cash equivalents.

In February 2022, Amazon commenced a Know Your Customer and account verification compliance requirement for the TRX EU account. This process remains outstanding despite Sellers making all commercially reasonable efforts to provide requested information. Recently, Amazon imposed account

level reserves, which are still in place for the TRX EU accounts. These account level reserves represent payable cash to Fitness Anywhere LLC.

As of August 19, 2022, the total payable funds currently accrued are $301,428.73. This cash balance, held within the account IDs below, will be disbursed to Fitness Anywhere LLC upon the completion of certain *Know Your Customer* account compliance confirmation activities being conducted by Amazon and once received will be part of the Excluded Assets. If any such funds are received by Buyer, Buyer will immediately turn over such funds to Sellers in the manner directed by Sellers.

| TRX Marketplace Account | TRX Account ID | Payable Funds (USD) |
|---|---|---|
| United Kingdom | 18146844172 | $ 95,142.13 |
| Germany | 18146859912 | $ 133,911.66 |
| France | 18146835862 | $ 30,850.89 |
| Spain | 18146798022 | $ 20,980.78 |
| Italy | 18146838352 | $ 15,098.50 |
| Netherlands | 18150825202 | $ 2,811.03 |
| Sweden | 18140283582 | $ 2,000.92 |
| Poland | 18085817242 | $ 452.82 |
| **Total** | | **$ 301,248.73** |

Schedule 1.2(e)

(a)   Insurance policies and all rights, title and interests therein, including those set forth in Schedule 1.1(j) which shall also be part of the Excluded Assets.

(b)   Employee Retention Tax Credit under the CARES Act for qualified wages paid between March 13, 2020 and September 30, 2021. A consultant for Fitness Anywhere LLC has calculated a total credit of $1,781,024.73. The Sellers have submitted the calculations to ADP for review and upon ADP's agreement with the calculations, ADP will file the necessary Forms 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund) with the IRS on behalf of Fitness Anywhere LLC.

(c)   Any and all tax refunds or credits in which either Seller has an interest.

Schedule 1.3

Designation Rights Assets

*Buyer shall have the right, by written notice to Sellers no later than one (1) day prior to the Closing Date, to specify that any Contract and/or asset that is not an Excluded Asset shall be held by Sellers (and, to the extent a Contract, not rejected pursuant to Section 365 of the Bankruptcy Code) (any such Contract or asset, including those Contracts set forth this Schedule 1.3 which Schedule 1.3 may be amended by Buyer at any time no later than one (1) day prior to the Closing Date (other than with respect to the addition of an Excluded Asset to Schedule 1.3) to treat such Contracts as Purchased Assets or Excluded Assets a "Designation Rights Asset") for the duration of the Designation Rights Period.*

**See attached list.**

Schedule 3.3

Exceptions to Purchased Assets Sold Free/Clear of Encumbrances

*Except as disclosed on* <u>*Schedule 3.3*</u> *hereto, Sellers have, and on the Closing Date will convey and transfer to Buyer, good, complete and marketable title to all of the Purchased Assets, free and clear of all Encumbrances of any nature whatsoever. Except as set forth on* <u>*Schedule 3.3*</u>*, all of the Purchased Assets (excluding customers) are in the exclusive possession and control of Sellers, and Sellers have the unencumbered right to use, and to sell to Buyer in accordance with the terms and provisions of this Agreement, all of the Purchased Assets without interference from and free of the rights and claims of others.*

        (a)    Inventory in transit/in possession of third parties holding possessory or other liens against such inventory.  Such inventory shall be sold subject to such possessory liens unless satisfied, released by holders of such liens, or Bankruptcy Court order.

<u>Schedule 8.5</u>

Third Party Consents

*Evidence of the receipt of all third-party consents necessary, if any, to enable Sellers to consummate the transactions contemplated herein, which consents are identified on <u>Schedule 8.5</u> except to the extent the Bankruptcy Court enters an order approving of Sellers' assumption and assignment to Buyer of the Assigned Contracts*

**EXHIBIT A**

**Definitions**

For the purposes of this Agreement, unless the context otherwise requires, the following terms shall have the respective meanings set forth below and grammatical variations of such terms shall have corresponding meanings:

"**Action**" means any action, dispute, claim, litigation, arbitration, mediation, prosecution, or other proceeding or investigation by or before an arbitrator, court or other regulatory or governmental body.

"**Auction**" means the auction sale of the Purchased Assets that was held at the law offices of Levene, Neale, Bender, Yoo & Golubchik L.L.P. on August 17, 2022, commencing at 10 a.m. PT, with zoom participation permitted, all in accordance with the Bankruptcy Court approved amended bidding procedures set forth in Docket No. 182.

"**Contract**" means any contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, understanding, instrument or other agreement, arrangement or commitment.

"**Designation Rights Asset**" has the meaning set forth in Section 1.5(a).

"**Designation Rights Period**" means the period commencing with the day after the Closing Date and continuing until September 27, 2022.

"**Encumbrance**" means any lien, claim, interest or encumbrance of any nature.

"**GAAP**" means generally accepted accounting principles in effect in the United States.

"**Intellectual Property Rights**" means, collectively, all (i) U.S. and foreign, whether registered or unregistered, patents, trademarks, trade names, trade dress, service marks, copyrights, and applications therefor, (ii) computer software programs or applications (in both source code and object code form), (iii) industrial models, inventions, invention disclosures, author's rights, designs, utility models, inventor rights, schematics, technology, (iv) trade secrets, know-how, and other tangible information or material, and (v) confidential information and any other proprietary data or information of any nature or form.

"**Knowledge**" of a party shall mean the actual knowledge of the officer or legal representative of Sellers who signs the Agreement.

"**Subsidiary Group**" means, collectively, the Seller Subsidiaries, TRX Training Japan Co. LTD and Fitness Anywhere UK Limited.

"**Subsidiary Group MAE**" means any event, change, occurrence or state of facts that has had, individually or in the aggregate, a material adverse effect on the business, properties, assets and liabilities of the Subsidiary Group, taken as a whole; provided, however, that in no event shall any of the following be taken into account in determining whether there has been, or would be, a Subsidiary

Group MAE: (a) changes in the U.S. or global economy or capital markets in general, (b) changes that affect generally the industry in which the members of the Subsidiary Group operate but that do not have a disproportionate effect on the Subsidiary Group relative to similar companies operating in such industry, (c) changes after the date hereof in any applicable law or the interpretation or enforcement thereof, or (d) any change arising in connection with acts of God, natural disasters, acts of war or terrorism.

**EXHIBIT B**

**Purchase Price Allocation**

**EXHIBIT C**

**<u>Form of Bill of Sale and Assumption Agreement</u>**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF SUBMISSION OF ASSET PURCHASE AGREEMENT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_August 24, 2022_**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender    rb@lnbyb.com**
- **Shawn M Christianson    cmcintire@buchalter.com, schristianson@buchalter.com**
- **Michael I. Gottfried    mgottfried@elkinskalt.com, cavila@elkinskalt.com**
- **Jonathan Gottlieb    jdg@lnbyg.com**
- **Michael J Hauser    michael.hauser@usdoj.gov**
- **Marsha A Houston    mhouston@reedsmith.com, hvalencia@reedsmith.com**
- **Ori Katz    okatz@sheppardmullin.com, lsegura@sheppardmullin.com**
- **Krikor J Meshefejian    kjm@lnbyg.com**
- **Ali M Mojdehi    amojdehi@btlaw.com, jgertz@btlaw.com;arego@btlaw.com;amattingly@btlaw.com**
- **Jennifer L Nassiri    JNassiri@sheppardmullin.com, bdelacruz@sheppardmullin.com**
- **Paul J Pascuzzi    ppascuzzi@ffwplaw.com, docket@ffwplaw.com**
- **Christopher O Rivas    crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com**
- **Lindsey L Smith    lls@lnbyg.com, lls@ecf.inforuptcy.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) **_August 24, 2022_**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **_August 24, 2022_**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 24, 2022 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**